[No. D060420. Fourth Dist., Div. One. July 13, 2012.]

In re Y.M., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
Y.M. et al., Defendants and Appellants, C.A., Respondent.

[No. D060834. Fourth Dist., Div. One. July 13, 2012.]

In re Y.M., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
Y.M. et al., Defendants and Appellants.

894

898

COUNSEL

Julie E. Braden, under appointment by the Court of Appeal, for Defendant and Appellant Y.M.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant M.M.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Suzanne Davidson for Respondent.

OPINION

**HALLER, J.**—Y.M. is a special needs child who was born and raised in Guatemala. When she was 14 years old, her father (Father), who lived in California, arranged for her abduction and illegal entry into the United States. Father then sexually and physically abused Y.M., and made her available to other men for sex. Y.M. was declared a dependent of the juvenile court after she suffered a head injury during a violent altercation between Father and a family member, and social workers with the San Diego County Health and Human Services Agency (Agency) learned of her circumstances. Later, federal authorities determined that Y.M. was a victim of human sexual trafficking and was entitled to protection under federal law. (See Trafficking Victims Protection Act of 2000, 22 U.S.C. § 7101 et seq. (TVPA); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 8 U.S.C. § 1232 et seq. (Wilberforce Act).)

The federal authorities arrested Father on federal sexual trafficking charges and the Guatemalan authorities initiated an investigation to determine her mother's role in Y.M.'s victimization.

At the Agency's request, and initially with Y.M.'s concurrence, Y.M. was placed in a federal program for "unaccompanied alien children."[1] Several months later, and over Y.M.'s objection, the juvenile court terminated Y.M.'s dependency case, concluding that a Guatemalan protocol pertaining to victims of human sexual trafficking was equivalent to an international treaty that deprived it of jurisdiction. As her principal appellate contention, Y.M. challenges this ruling.

As we shall explain, the Guatemalan protocol is not a treaty and federal laws pertaining to children who are the victims of human sexual trafficking do not preempt state dependency law. Instead, concurrent jurisdiction exists, triggering similar, but not identical, statutory provisions that govern the juvenile court's consideration whether to terminate state dependency court jurisdiction. Although both systems protect children and seek to facilitate family reunification and/or repatriation, the focus of each system differs and the respective systems are not entirely commensurate. In contrast to the child-centered focus of the California dependency system (Welf. & Inst. Code,[2] § 300.2; see § 300 et seq.), the purpose of the TVPA and Wilberforce Act is to combat human trafficking, ensure just and effective punishment of traffickers and protect their victims. (22 U.S.C. § 7101(a).) Here, Y.M., who was both a dependent of the California juvenile court and a victim of human sexual trafficking, was entitled to protections afforded by both systems.

Because the juvenile court erred when it dismissed Y.M.'s dependency case premised on the erroneous belief it lacked jurisdiction, remand is necessary to allow the juvenile court to make findings required under relevant provisions of sections 366.21, subdivision (e), and 366. In doing so, the court shall consider federal and state programs available to Y.M. as a victim of human sexual trafficking, and its decisions shall be guided by Y.M.'s best interests. However, the court shall not change Y.M.'s custody or placement without the approval of federal authorities.

---

[1] The phrase "unaccompanied alien child" means a child who has no lawful immigration status in the United States, has not attained 18 years of age and does not have a parent or legal guardian in the United States who is available to provide for the child's care and physical custody. (6 U.S.C. § 279.) For convenience, we generally use the term "unaccompanied child" in this opinion. However, because special immigrant juvenile provisions apply to individuals under 21 years of age, we use the term "unaccompanied minor" when referring to proceedings under title 8 United States Code section 1101(a)(27)(J).

[2] Unless otherwise indicated, further statutory references are to the Welfare and Institutions Code.

Y.M. and her mother, M.M. (Mother), also appeal several rulings the juvenile court made before terminating jurisdiction. We conclude the court erred when it (1) denied Y.M.'s petition to terminate reunification services to Father and (2) declined to make findings relevant to Y.M.'s potential eligibility for special immigrant juvenile (SIJ) status (which can lead to permanent residency). We also determine the court did not err when it (1) denied Mother's petition to return Y.M. to her custody in Guatemala and (2) denied Y.M.'s petition to remove her from federal custody and place her in a foster home in San Diego.

## FACTUAL AND PROCEDURAL BACKGROUND

Y.M., now 17 years old, is a native of Guatemala. She is intellectually disabled, illiterate, partially deaf and appears physically younger than her age. When Y.M. was one year old, Mother left her in the care of her maternal grandmother, who lived nearby. Shortly after Y.M.'s birth in 1995, Father left his home country for California, where he worked, married and had a family. He did not maintain contact with Y.M.

In approximately March 2010, when Y.M. was 14 years old, Father telephoned Mother and sent her $400. A short time later, Y.M. was abducted from her home by a paternal uncle. Mother did not notify the Guatemalan authorities of Y.M.'s disappearance. With the assistance of another paternal uncle, Y.M. was illegally brought to San Diego County to live with Father, his wife and their children.

Father routinely forced Y.M. to have sexual relations with him and subjected her to physical abuse when she objected. He hit her to prevent her from leaving the home. In July Y.M. was raped by her stepmother's cousin, who was arrested and incarcerated. Y.M. said at times Father took her to a " 'house where there were a lot of men and women' " and a large number of rooms and beds. There, Father " 'let other men do bad things' " to her and hit her when she refused to comply.

Mother telephoned Y.M. one month after her abduction and asked her when she was going to send money. Y.M. responded that she did not have any money.

On September 2, 2010, Y.M. came to the attention of the Agency after she suffered a head wound during a violent altercation between Father and his brother-in-law. The family told police the stepmother had witnessed Father and Y.M. in an inappropriate sexual situation. Y.M.'s physical examination was abnormal, with findings indicative of acute and chronic sexual abuse.

Father was arrested on charges of lewd and lascivious acts with a child. A week later the charges were dropped and Father was deported to Mexico.

Y.M.'s stepmother produced a Mexican birth certificate for Y.M. Father said Mother lived in Chiapas, Mexico. The Agency initiated a parent search for Mother but did not locate her before the jurisdictional and dispositional hearings.

In October, the juvenile court sustained the petition filed on behalf of Y.M. under section 300, subdivisions (b) and (d), removed her from the custody of her parents, and ordered a plan of family reunification services for Father.

The Agency initially placed Y.M. in foster care and facilitated biweekly visitation with her three younger half sisters. Due to behavioral problems, Y.M. was transferred to a group home. She became assaultive with staff and peers and was admitted to an inpatient psychiatric facility. Y.M. was diagnosed with posttraumatic stress disorder and depression. She disclosed she had been physically abused since she was a young child.

Several weeks after the dispositional hearing, the Agency learned that Y.M.'s Mexican birth certificate was a forgery and that Y.M. was from Guatemala. The Agency contacted the Consulate General of Guatemala, which interviewed Y.M. in December and initiated a parent search for Mother. When the social worker confronted Father with information that Y.M. was from Guatemala, Father provided Mother's telephone number to the social worker, who immediately contacted her. Mother said she wanted Y.M. to be returned to her custody to cook, clean and care for her younger siblings. She also reported that Y.M. would not attend school in Guatemala and said Y.M. was more useful as a housekeeper and caregiver for her younger siblings.

In February, the results of a DNA test indicated that Father and an unknown individual had had sexual relations with Y.M. Father was arrested by federal authorities at the international border and charged with transportation of a minor with the intent to engage in criminal sexual activity. He faced a minimum sentence of 10 years to life. (18 U.S.C. § 2423(a).) The Consulate General of Guatemala referred the case to Guatemalan authorities to determine whether Mother had violated Guatemalan law prohibiting sexual violence, exploitation, and human trafficking.

The Agency was working with United States Immigration and Customs Enforcement (ICE), the Office of Refugee Resettlement in the United States

Department of Health and Human Services[3] (ORR or federal agency), and the Bilateral Safety Corridor Coalition (BSCC)[4] to provide services appropriate to Y.M.'s needs as a victim of human sexual trafficking. In March, ORR determined that Y.M. was eligible to apply for benefits and services under any federal or state program pursuant to the TVPA. Y.M. also qualified for services with ORR's Division of Unaccompanied Children's Services (DUCS) under the Unaccompanied Refugee Minors (URM) Program.[5] The Agency informed the court that, as a victim of human sexual trafficking, Y.M. was eligible for T visa status which would stay her deportation proceedings. The Agency did not inform the juvenile court at that time that Y.M. could also apply for SIJ findings that would allow her to adjust her immigration status in the United States to lawful permanent resident within one year.[6] (See Discussion, pt. III., *post.*) The social worker also reported that ORR had specialized resources to assist Y.M. and asked the juvenile court to transfer the case to the federal agency and terminate dependency jurisdiction.

Minor's counsel said Y.M. did not want to return to Guatemala and it appeared the federal program would be better able to meet Y.M.'s needs because it addressed issues specific to victims of human sexual trafficking. Counsel further noted the Agency had not been able to find a stable placement for Y.M., and had placed her in a federal shelter care facility for refugee youth.

In March, over Mother's objection, the juvenile court authorized Y.M.'s placement in a federal refugee resettlement program. The placement order was not appealed. The court deferred a ruling on the Agency's recommendation to dismiss dependency jurisdiction.

---

[3] The Director of the Office of Refugee Resettlement is responsible for coordinating and implementing the care and placement of unaccompanied children who are in federal custody by reason of their immigration status, ensuring that the interest of the child is considered in decisions and actions relating to his or her care, and reuniting an unaccompanied child with a parent abroad in appropriate cases. (6 U.S.C. § 279(b)(1).)

[4] BSCC is an alliance of more than 60 government and nonprofit agencies in the United States and Latin America seeking to prevent and intervene in the commercial and sexual exploitation of men, women and children, and providing various programs to achieve this goal. (BSCC <http://www.bsccoalition.org> [as of July 13, 2012].)

[5] Under the URM program, services may be provided to a refugee child who is unaccompanied by a parent or other close adult relative, until the month after the child attains 18 years of age or such higher age as the state's child welfare services plan prescribes for the availability of such services to any other child in that state. (8 U.S.C. §§ 1232(c)(2), 1522(d)(2)(B)(i); see 42 U.S.C. § 621 et seq.) Services include child welfare services, foster care maintenance payments and health care, and special educational services, including English language training. (8 U.S.C. § 1522(d)(1), (2)(A).)

[6] In Los Angeles County, the Los Angeles County Department of Children and Family Services (DCSF) requires the social worker to refer all dependent, unaccompanied minors for SIJ status as soon as the minor becomes eligible. (DCFS, Procedural Guide, 1200-500.85 (Rev. 12/11) p. 2; see Super. Ct. L.A. County, Local Rules, rule 6.15.)

The Consulate General of Guatemala, noting the juvenile court had "turned over jurisdiction to the corresponding federal authorities," consented to Y.M.'s transfer to federal custody. The consulate general said based on Y.M.'s status as a possible victim of human trafficking, the child's best interest should control all stages of the proceedings in accordance with its "Inter-Institutional Protocol for the Repatriation of Victims of Human Trafficking of the Republic of Guatemala" (Guatemalan Protocol or Protocol).

In April, ORR placed Y.M. in a residential treatment facility in Florida, where she received psychiatric care, therapy and schooling. Y.M. was diagnosed with an adjustment disorder with depression and anxiety, mood disorder, impulse control disorder and mild mental retardation. She could not hear high pitches and received hearing aids. According to the ORR clinical supervisor, Y.M. did not appear to understand abstract concepts such as family reunification and other legal matters and would benefit from the services of a court-appointed guardian ad litem.

In July, Y.M. filed an objection to the Agency's earlier recommendation to terminate dependency jurisdiction. She asked the juvenile court to make findings that would allow her, as a dependent of the juvenile court, to obtain SIJ status. Father objected to the request, which required judicial findings that reunification with one or both parents was not viable, and that it was not in Y.M.'s best interests to be returned to Guatemala.

Y.M.'s counsel informed the juvenile court the federal agency had placed Y.M. in a locked psychiatric facility. Y.M. objected to the placement and filed a section 388 petition asking the juvenile court to remove her from the federal program and return her to San Diego. She also asked the court to terminate family reunification services with Father.

Mother filed a section 388 petition asking the juvenile court to place Y.M. in her care or, alternatively, order a plan of family reunification services. The Consulate General of Guatemala informed the court that in view of Mother's circumstances, if the juvenile court decided to reunify the family, there was no guarantee Y.M. would receive the necessary care in Guatemala to overcome the trauma she had suffered.

At the six-month review hearing on August 25, the juvenile court heard Y.M.'s and Mother's petitions for modification; Y.M.'s request for SIJ findings; and the Agency's request to terminate jurisdiction. The juvenile court admitted the Agency's reports in evidence, including a translated portion of the Guatemalan Protocol, and correspondence and explanatory materials from ORR about its programs for refugee youth.

The social worker testified that she did not believe it was in Y.M.'s best interests to be returned to Mother's care. When Y.M. was a baby, Mother left

her in her grandmother's care. Y.M. said Mother hit her and pulled her hair. The social worker believed that Y.M. would likely be abducted again if returned to Mother's care in Guatemala. Mother had reported that one of Y.M.'s paternal uncles had been to her home several times, demanding her identification papers and Y.M.'s birth certificate.

The juvenile court denied Mother's request for custody, finding that Y.M. had suffered great trauma from being physically abused when she was a child. However, the court noted Mother was statutorily entitled to reunification services and granted her section 388 petition to that extent.

The juvenile court declined to issue findings to allow Y.M. to apply for SIJ status, stating that ICE was aware of her circumstances and had granted her "Continued Presence" status, which stayed her deportation proceedings for a year. The court said the fundamental issue was whether it could maintain its jurisdiction once federal jurisdiction had been established. Referring to the Guatemalan Protocol, it noted that a state court could not "override what is, in essence, an agreement at the level of at least a treaty between the United States and Guatemala" regarding the treatment of Guatemalan citizens forced into human trafficking and brought to the United States. The court also found it was appropriate to terminate its jurisdiction because Y.M. was participating in a "specifically designed [federal] program to repatriate her to her home country and to give her assistance and services to facilitate that goal," and state dependency courts were not designed for that purpose.

At the request of Y.M.'s counsel, the juvenile court stayed its order terminating jurisdiction to allow counsel to file a petition for writ of supersedeas and request for stay in this court. On October 25, 2011, this court denied the petition for writ of supersedeas and request for stay.

At a hearing two days later, Father and Mother asked the juvenile court to stay its order terminating jurisdiction. Y.M. joined in this request. Y.M.'s counsel informed the court that Y.M. had been unable to complete the T visa requirements due to her disabilities, and a deportation hearing was set for November 17. The social worker said the Agency and an ICE agent were assisting Y.M.'s immigration attorney to collect the information required for Y.M.'s T visa application, and the ICE agent had authorized Y.M.'s continued presence in the United States and was sending of copy of that authorization to the immigration attorney.

The juvenile court found there was no evidence to show that Y.M. was in imminent danger of deportation and declined to stay its order terminating dependency jurisdiction.

## DISCUSSION

### I. *Juvenile Court Erred in Terminating Jurisdiction*

As her primary appellate contention, Y.M. argues the juvenile court erred when it terminated dependency jurisdiction. In dismissing jurisdiction, the court found it no longer had authority over the case because the Guatemalan Protocol mandated her repatriation and the federal government had exclusive jurisdiction. We determine both of these conclusions were erroneous. As we shall explain, the juvenile court erred in treating the Guatemalan Protocol as a federal treaty that took precedence over state law. The court also erred to the extent it concluded that a dependent child's placement in a federal program for human trafficking victims preempted state dependency jurisdiction. Instead, concurrent federal and state jurisdiction exists. Because the court's findings and decisions were based on erroneous legal conclusions, and the court failed to make findings required under the California dependency scheme (§§ 388, 390), reversal and remand are appropriate.

### A. *Guatemalan Protocol*

In dismissing jurisdiction, the juvenile court found that the Guatemalan Protocol was "in essence, an agreement at the level of at least a treaty between the United States and Guatemala" and as such preempted the authority of the juvenile court. This finding is unsupported.

In October 2000, the United States Congress, recognizing human trafficking as a modern form of slavery, passed the TVPA to combat trafficking in persons, ensure just and effective punishment of traffickers and protect their victims. (22 U.S.C. § 7101(a); Pub.L. No. 106-386 (Oct. 28, 2000) 114 Stat. 1464.) Congress found that approximately 50,000 women and children are trafficked into the United States each year, and many of these persons are trafficked into the international sex trade, often by force, fraud or coercion. (22 U.S.C. § 7101(b)(1), (2).) Traffickers primarily target women and girls, who are disproportionately affected by poverty, often forcing them through physical violence to engage in sex acts or perform slavery-like labor. (22 U.S.C. § 7101(b)(4), (6).)

In December 2000, Congress ratified a United Nations protocol recognizing that effective antitrafficking action requires a comprehensive international approach. (Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, art. 2, Nov. 15, 2000, T.I.A.S. No. 13127 (U.N. Protocol).) The U.N. Protocol obligates its state parties to

adopt laws to make human trafficking a criminal offense, establish comprehensive policies, programs and other measures to prevent and combat trafficking in persons, protect victims, especially women and children, from revictimization, and strengthen border controls to prevent and detect trafficking in persons. (*Id.*, arts. 5, 9, 11.) It asks each member country to consider adopting measures to permit human trafficking victims to remain in its territory, temporarily or permanently, in appropriate cases. (*Id.*, arts. 7, 8, par. 2.)

As mandated by Congress, the United States Department of State produces an annual report rating countries on the quality of their participation in combating human trafficking. (22 U.S.C. § 7107; see 22 U.S.C. §§ 7109a, 7112.) Tier 1 countries fully comply with the TVPA's minimum standards for the elimination of trafficking. (U.S. Dept. of State, Trafficking in Persons (TIP) Rep. 2011 <http://www.state.gov/j/tip/rls/tiprpt/2011/> [as of July 13, 2012].) Tier 2 countries do not fully comply with the TVPA's minimum standards but are making significant efforts to do so. Tier 2 watch list countries are countries whose governments do not fully comply with the TVPA's minimum standards but despite significant efforts to do so, the absolute number of victims of severe forms of trafficking is very significant or significantly increasing, or there is a failure to produce evidence of increasing efforts to combat severe forms of trafficking from the previous year. Tier 3 countries do not comply with the TVPA's minimum standards and are not making significant efforts to do so. Tier 3 countries may be subject to nonhumanitarian, nontrade-related sanctions from the United States if they do not take significant antislavery action within a 90-day grace period of the report's issuance. (TIP Rep. 2011; 22 U.S.C. § 7107(c), (d).)

Although Guatemala acceded to and joined the U.N. Protocol in 2004,[7] it remained on the State Department's tier 2 watch list from 2007 to 2010. (U.S. Dept. of State TIP Rep. 2010 <http://www.state.gov/j/tip/rls/tiprpt/2010/142760.htm> [as of July 13, 2012].) In 2011, the State Department designated Guatemala as a tier 2 country, but continued to identify Guatemala as "a source, transit, and destination country for men, women and children subjected to sex trafficking and forced labor." (U.S. Dept. of State, TIP Rep. 2011, p. 175 <http://www.state.gov/j/tip/rls/tiprpt/2011/164232.htm> [as of July 13, 2012].) "Guatemalan women and children are found in forced and child prostitution within the country, as well as in Mexico and the United States." (*Ibid.*; see TIP Rep. 2010.) The State Department reported that Guatemalan investigative units remained underfunded, many judges and law enforcement officials were poorly informed about human trafficking, and official complicity in trafficking continued to

---

[7] U.N. Protocol <http://treaties.un.org/Pages/ViewDetails.aspx?src=IND&mtdsg_no=XVIII-12-a&chapter=18&lang=en> (as of July 13, 2012).

impede antitrafficking efforts. However, Guatemala increased funding for co-ordinated antitrafficking efforts and *developed an antitrafficking protocol,* which it issued in January 2011. (TIP Rep. 2011; see Guatemalan Protocol, Ministerio de Relaciones Exteriores de Guatemala, Protocolo Interinstitucional para la Repatriación de Víctimas de Trata de Personas <http://www.minex.gob.gt/ Consulta_Doc.aspx?IdDoc=1742> [as of July 13, 2012].)

The Guatemalan Protocol was developed jointly by the Guatemalan Ministry of Exterior Public Relations and the International Labour Organization (ILO), the United Nations agency responsible for delineating and overseeing international labor standards, to assist Guatemalan efforts to meet minimum standards for the elimination of human trafficking in compliance with the U.N. Protocol. (ILO <www.ilo.org/global/about-the-ilo/lang--en/ index.htm> [as of July 13, 2012].) The Guatemalan Protocol outlines the steps its various government agencies are to take on behalf of Guatemalans who are victims of human trafficking abroad or Guatemalan or foreign individuals who are victims of trafficking in Guatemala.

 There is no mention of the United States or its laws respecting human trafficking in the Guatemalan Protocol. Rather, in chart form, the Guatemalan Protocol identifies the Guatemalan government agencies responsible at each stage of a human trafficking case and the standards of conduct that govern each agency's decisionmaking. The Protocol is an internal Guatemalan document. Contrary to the juvenile court's findings, the Protocol is not an agreement or treaty between Guatemala and the United States, and does not preempt California dependency law. The juvenile court erred when it relied on the Protocol as the basis for its dismissal order.

In dismissing Y.M.'s dependency case, the court also appears to have determined the Guatemalan Protocol mandated Y.M.'s repatriation. Although that is a goal of antitrafficking protocols, repatriation of a Guatemalan child who is a human trafficking victim is not mandatory, and the best interest of the child controls at all stages of the proceedings. Guatemala's adoption of its Protocol complies with the U.N. Protocol, which provides that the return of a human trafficking victim to his or her country of nationality or prior residence "shall be with due regard for the safety of that person and for the status of any legal proceedings related to the fact that the person is a victim of trafficking and shall preferably be voluntary." (U.N. Protocol, T.I.A.S. No. 13127, arts. 7, 8, par. 2.)

Here, the record shows that the Consulate General of Guatemala consented to Y.M.'s placement in the custody of the United States. It advised there was

no guarantee Y.M. would receive the necessary care in Guatemala to overcome the trauma she had suffered as a result of forced sexual activity and physical and emotional abuse. The consulate general also referred the matter to Guatemalan authorities to investigate Mother's role in Y.M.'s victimization. The record further shows that Father and other paternal family members, including an uncle currently living in Guatemala, were involved in trafficking Y.M. into sexual slavery. The social worker believed Y.M. would remain at risk of abduction if returned to Guatemala. On remand, the court shall consider this and all updated evidence in making all further rulings. (§§ 366.21, subd. (e), 366.3.)

### B. *Federal Custody Placement*

Y.M. also contends the court erred to the extent it concluded it was required to terminate jurisdiction after placing her in federal custody. We agree with this contention.

■ The "[p]ower to regulate immigration is unquestionably exclusively a federal power." (*De Canas v. Bica* (1976) 424 U.S. 351, 354 [47 L.Ed.2d 43, 96 S.Ct. 933]; see *In re Jose C.* (2009) 45 Cal.4th 534, 550 [87 Cal.Rptr.3d 674, 198 P.3d 1087]; *In re Adolfo M.* (1990) 225 Cal.App.3d 1225, 1232 [275 Cal.Rptr. 619].) The federal government has the exclusive authority to determine who should or should not be admitted into the country, and the conditions under which a legal immigrant may remain. "However, it does not follow that all state regulations touching on aliens are preempted." (*Sturgeon v. Bratton* (2009) 174 Cal.App.4th 1407, 1422 [95 Cal.Rptr.3d 718]; see *In re Jose C., supra*, 45 Cal.4th at p. 550.) "[T]he usual rules of statutory preemption analysis apply; state law will be displaced only when affirmative congressional action compels the conclusion it must be." (*In re Jose C., supra*, 45 Cal.4th at p. 550.)

Under these principles, federal courts have long recognized that state courts have jurisdiction over child welfare determinations, including matters pertaining to undocumented minors, absent an express federal provision to the contrary. Federal law imposes requirements on state dependency plans and recognizes "the institutional competence of state courts as the appropriate forum for child welfare determinations regarding abuse, neglect, or abandonment, and a child's best interests." (*Perez-Olano v. Gonzalez* (C.D.Cal. 2008) 248 F.R.D. 248, 265 (*Perez-Olano*); see 42 U.S.C. §§ 5106a, 5101 et seq.) Congress expressly anticipates that a child victim of human trafficking may be in the custody of an agency of a state, or an individual or entity appointed by a juvenile court, acting in loco parentis. (8 U.S.C. § 1232(d)(5).) Further, a child victim of human trafficking may qualify for refugee status. (8 U.S.C. § 1101(a)(42).) To meet its goal to assist refugee children, the federal

government directs the states to provide for unaccompanied refugee children who are present in that state and to establish procedures for their care and supervision, including legal custody and/or guardianship under state law. (45 C.F.R. § 400.5(e) (2011); see generally 45 C.F.R. § 400.1 et seq. (2011).)

 Also, as specifically relevant here, Congress expressly approves and promotes effective state law enforcement of state laws to eradicate human trafficking and punish traffickers, and provide additional services to trafficking victims, especially children. (Pub.L. No. 110-457 (Dec. 23, 2008) § 225, 122 Stat. 5044; see, e.g., the Abolition of Child Commerce, Exploitation, and Sexual Slavery Act of 2011, Assem. Bill No. 12 (2011–2012 Reg. Sess.); see also Pen. Code, §§ 261.9, 236.1 et seq., 13519.14; Civ. Code, §§ 52.5, 1714.43; Rev. & Tax. Code, §§ 18809.1, 18809.2; Welf. & Inst. Code, § 18945.) Although federal legislation directed at combating human trafficking, ensuring just and effective punishment of traffickers, protecting their victims and providing special treatment for child trafficking victims is comprehensive, it is not exclusive. (22 U.S.C. § 7101(a); 8 U.S.C. § 1232.) Federal statutes that regulate the immigration status of a human trafficking victim who has been illegally brought into the United States do not automatically deprive the state of jurisdiction to protect and assist such a victim, whether through dependency proceedings, if appropriate, or other state laws. (8 U.S.C. §§ 1101(a)(15)(T), (27)(J), 1232(d)(2); 28 C.F.R. § 1100.35 (2012); Welf. & Inst. Code, §§ 300, 18945; see Pen. Code, §§ 261.9, 236.1 et seq., 13519.14; Civ. Code, §§ 52.5, 1714.43; Rev. & Tax. Code, §§ 18809.1, 18809.2.) When an unaccompanied child has been a victim of human trafficking, or parental abuse or neglect in this state, federal immigration law limits, but does not preempt, the jurisdiction of the juvenile court. (See *Perez-Olano, supra,* 248 F.R.D. at p. 252; 8 U.S.C. § 1101(a)(27)(J)(iii)(I).)

Consistent with these principles, at the outset of this case, all parties and the court agreed that the state had the authority to assume jurisdiction over Y.M. When the juvenile court initially declared Y.M. a dependent it did so based on its authority to exercise emergency jurisdiction to protect children within its borders from physical or sexual abuse or other mistreatment. (Fam. Code, § 3424; *In re Angel L.* (2008) 159 Cal.App.4th 1127, 1140 [72 Cal.Rptr.3d 88] [once the court detained the children and declared them dependents of the court, its temporary emergency jurisdiction ripened into permanent jurisdiction and Cal. became their home state].) The juvenile court then implemented relevant dependency statutes to promote Y.M.'s best interest and facilitate family reunification, if possible. (§ 300 et seq.) Later, when the federal government determined Y.M. was a human trafficking victim entitled to refugee status, she became eligible for federal and state programs under federal statutes. (6 U.S.C. § 279(b)(1); 8 U.S.C. §§ 1232(c)(2), 1522(d).) At that point, the court concluded that Y.M.'s many

needs could best be addressed in a federal program for child victims of human trafficking and placed her in the custody of a federal agency.

The court's authority to have issued these orders is unchallenged in this proceeding. However, an issue exists as to whether the court continued to have jurisdiction over Y.M. after placing her in federal custody.

In 1990, Congress enacted the SIJ provisions of the Immigration and Nationality Act (8 U.S.C. § 1101 et seq.) (the SIJ statute). (*Perez-Olano, supra*, 248 F.R.D. at p. 252, citing 8 U.S.C. §§ 1101(a)(27)(J), 1225(a).) These provisions create a path for abused, neglected and abandoned unaccompanied minors to become lawful permanent residents of the United States. (248 F.R.D. at p. 252, citing 8 U.S.C. §§ 1101(a)(27)(J), 1225(a).)

A provision in the Immigration and Nationality Act (INA) states that: "[N]o juvenile court has jurisdiction to determine the custody status or placement of an alien in the custody of the Secretary of Health and Human Services unless the Secretary of Health and Human Services specifically consents to such jurisdiction" (federal-consent rule). (8 U.S.C. § 1101(a)(27)(J)(iii)(I).) This federal-consent rule is part of the statutory scheme providing a method for abused, neglected and abandoned immigrant children to become lawful permanent residents of the United States through SIJ provisions. (*Perez-Olano, supra*, 248 F.R.D. at p. 264.) Under the SIJ provisions, immigrant children may petition a federal agency "to be recognized as special immigrant juveniles." (*Id.* at p. 253.) To be eligible for SIJ classification, the SIJ provisions require that a state court make findings that the immigrant child meets certain statutory criteria. (8 U.S.C. § 1101(a)(27)(J)(i)–(ii); see Discussion pt. II., *post.*) Once a state court makes these SIJ-predicate findings, a child may file an I-360 petition with the federal government, and if that petition is granted, the child may then apply for adjustment to lawful permanent resident status. (*Perez-Olano, supra*, at p. 253.)

The United States Attorney General previously interpreted the federal-consent rule contained in the SIJ provisions to mean that minors in federal custody must obtain the federal government's "specific consent to state court jurisdiction, prior to seeking an SIJ-predicate order in state court." (*Perez-Olano, supra*, 248 F.R.D. at p. 263.) However, a class of unaccompanied minors who had been denied specific consent challenged this interpretation, asserting that it was contrary to congressional intent. (*Id.* at p. 254.) In *Perez-Olano*, the federal district court agreed and issued an injunction prohibiting the federal government from requiring this consent. (*Ibid.*) The court reasoned that the federal-consent rule was intended to apply *only* to orders issued by a state juvenile court that specifically pertain to custody and

placement decisions. (*Id.* at pp. 264–266.) The court explained that "by limiting the specific consent requirement to custody and placement decisions, Congress appropriately reserved for state courts the power to make child welfare decisions, an area of traditional state concern and expertise. [Citation.] The SIJ statute affirms the institutional competence of state courts as the appropriate forum for child welfare determinations regarding abuse, neglect, or abandonment, and a child's best interests." (*Id.* at p. 265.) The court concluded that the federal-consent rule "balances competing federal and state interests," by permitting states to apply and enforce state juvenile dependency law with respect to immigrant minors, but limiting the scope of state court actions that may be applied to minors in federal custody. (*Id.* at pp. 265–266.)

■ The *Perez-Olano* court's interpretation of the federal statute supports a conclusion that the juvenile court was not deprived of jurisdiction upon transferring custody of Y.M. to the federal government. Although the federal-consent rule prohibits the juvenile court from making any changes to custody or placement decisions without the consent of the federal government, it does not reflect congressional intent to wholly eliminate the state court's jurisdiction to make other types of orders that are in the minor's best interest. Where, as here, the state court assumes jurisdiction over a minor based on facts showing sexual abuse and that she was a victim of sexual trafficking, the state does not lose its authority to protect the minor. As noted, the state and federal programs differ and to the extent that Y.M. may benefit from special state programs, the court may have a continuing interest in ensuring those programs are made available to Y.M. At the very least, as explained below, the court was required to maintain jurisdiction to consider issuing the SIJ-predicate findings to allow Y.M. to begin the process of filing for lawful permanent resident status under federal law.

In reaching these conclusions, we reject the Agency's contention that *Perez-Olano* is distinguishable because Y.M. was a victim of human trafficking. The plaintiffs in *Perez-Olano* were immigrant youth who similarly sought to apply for SIJ status on the basis that they had been abused, neglected or abandoned. The fact that Y.M.'s abuse, neglect, and abandonment arose from human trafficking is not material with respect to the continued authority of the state court to exercise concurrent jurisdiction over her. Although the federal government has a strong interest and has promulgated numerous laws seeking to protect sexual trafficking victims such as Y.M., these laws do not reflect an intent to deprive state governments of jurisdiction over unaccompanied minors where appropriate.

■ Y.M. is not merely a victim of human sexual trafficking, subject only to federal jurisdiction. As a result of the sexual, physical and emotional abuse

perpetrated against her by Father in California, and the uncertain circumstances of Mother, who was under investigation by Guatemalan authorities for her role in Y.M.'s victimization, Y.M. is also entitled, under federal and state law, to the broader protections of the California dependency system. The juvenile court erred when it determined its jurisdiction was preempted by federal law and dismissed Y.M.'s dependency case on that basis.

## C. *Required Findings Under Sections 388 and 390*

■ After a child has been declared a dependent of the juvenile court, the child's parent, the child, or a person having an interest in the child may petition the juvenile court to terminate dependency jurisdiction. (§ 388, subd. (a).) The juvenile court must conduct a hearing on the petition if it appears that the best interests of the child may be promoted by terminating jurisdiction. (§ 388, subd. (d); Cal. Rules of Court,[8] rule 5.570(e)(1).) Once that prima facie showing has been made and a hearing is held, the court may dismiss the dependency petition if the court finds that "the interests of justice and the welfare of the minor require the dismissal, and that the parent or guardian of the minor is not in need of treatment or rehabilitation."[9] (§ 390; *In re Marcus G.* (1999) 73 Cal.App.4th 1008, 1014 [87 Cal.Rptr.2d 84]; see § 391 [controlling termination of dependency court jurisdiction for a dependent who is 18, 19, or 20 years old].) Here, these findings were not made, nor can they be inferred from the record.

In making these findings, it is incumbent on the juvenile court to take into account the child's physical, emotional, and psychological needs; the circumstances of the child's parents; and any other factor that may affect the child's welfare, both current and prospective. If a dependent child is in the actual or constructive custody of the federal government because of his or her immigration status, the state court cannot make custody or placement decisions without the consent of the federal government, but the court retains its responsibility to make the findings required under the dependency statutes and, in keeping with the overarching goals to protect the child and promote his or her best interests, issue state dependency orders to the fullest extent its jurisdiction allows.

---

[8] All further rule references are to the California Rules of Court.

[9] Alternatively, the juvenile court may transfer jurisdiction to another state court under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), Family Code section 3400 et seq. (Fam. Code, § 3427.) Here, although a child protection specialist with ORR advised that if San Diego County terminated dependency jurisdiction, the state in which Y.M. was placed could establish jurisdiction, the better practice is to transfer jurisdiction to the child's new state under the UCCJEA before terminating juvenile court jurisdiction. (See 45 C.F.R. § 400.119 (2011) [after the initial placement of an unaccompanied child, the same procedures that govern the movement of nonrefugee foster cases to other states apply to the movement of unaccompanied children to other states].)

Although the state and federal governments afford protection to child victims of human trafficking, there are important differences between the two systems. The purpose of the California dependency system is to "provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, . . . and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§§ 300.2, 300 et seq.) The dependency system is child-centered and is designed to protect the child, reunify the family where safe for the child and find a permanent home for the child when reunification is not possible. Its guiding light is the child's best interests. By contrast, the purpose of the federal law is to combat human trafficking, ensure just and effective punishment of traffickers and protect their victims. (22 U.S.C. § 7101(a).) Although a federal agency is responsible for ensuring that the *interests* of the child are considered in decisions and actions relating to the child while in the federal agency's actual or constructive custody, and in deciding whether repatriation is appropriate, the federal agency's objectives are broader and not necessarily focused solely on the child's best interest. (6 U.S.C. § 279(b)(1); but see 8 U.S.C. § 1232(c)(5).)

There are also important procedural differences. A dependent child is entitled to the appointment of a Child Abuse Prevention and Treatment Act (42 U.S.C. § 5101 et seq.) guardian ad litem and to the appointment of competent counsel. (42 U.S.C. § 5106a; Welf. & Inst. Code, §§ 317, subd. (e), 317.5.) However, legal representation and advocacy for an unaccompanied minor who is not in the dependency system is far less certain. Federal law provides that all unaccompanied children from noncontiguous countries who are or have been in federal custody be appointed counsel, but directs federal agencies to make every effort to use the services of pro bono counsel who agree to provide representation to the child without charge. (8 U.S.C. § 1232(c)(5).) Similarly, Congress has authorized, but not mandated, the appointment of independent child advocates for child trafficking victims.[10] (8 U.S.C. § 1232(c)(6).)

Additionally, a dependent child is entitled to monthly visits from the child's social worker; judicial review of the child's status at least once every six months; delineated foster care rights; the right to contest a placement

---

[10] In fiscal year 2011, ORR expanded a project to provide legal services to all unaccompanied children, allowing 6,594 children in ORR care and 406 released children to receive legal services. ORR also matched 174 exceptionally vulnerable unaccompanied alien children with child advocates. (ORR, FY2011 Year-end Newsletter <http://www.acf.hhs.gov/programs/orr/press/2011_Year_End_Newsletter.htm> [as of July 13, 2012]; see Byrne & Miller, The Flow of Unaccompanied Children Through the Immigration System (Vera Inst. of Justice, Mar. 2012) pp. 4–5, 7–8, 23–24 <http://www.vera.org/download?file=3483/the-flow-of-unaccompanied-children-through-the-immigration-system.pdf> [as of July 13, 2012].)

order or seek a change of placement in a judicial proceeding; the selection and implementation of a permanent plan if the child cannot be safely reunited with a parent; and access to services commensurate with the child's best interests until the age 21. (§§ 361.2, 361.3, 366, subd. (a), 366.21, 366.22, 366.26, 388, 16001.9, 16516.5.) The federal immigration system does not provide the same protections to an unaccompanied child in its actual or constructive custody. (Compare, e.g., 8 U.S.C. § 1232(c)(2) with Welf. & Inst. Code, § 16001.9.) Further, under federal law, if an unaccompanied child's immigration status is not stabilized by the time the child is 18 years old, and the minor is not in a state such as California that provides such services until age 21, the minor will "age out" of federal care and be placed in an adult detention facility. (8 U.S.C. § 1522(d)(2)(B)(i); see Welf. & Inst. Code, § 303, subd. (a) [juvenile court may retain jurisdiction over a dependent child until that child attains 21 years of age].)

The juvenile court abused its discretion when it dismissed Y.M.'s dependency case without making the findings required under section 390. The court made a conclusory decision about Y.M.'s repatriation to Guatemala which was not factually supported, and did not properly consider whether Y.M.'s welfare and the interests of justice required the dismissal, considering the comparative services, structure and resources available to Y.M. through the state dependency system and the federal unaccompanied children's program.

## II. *Juvenile Court Erred when It Did Not Make SIJ-predicate Findings*

Y.M. next contends the court erred in refusing to make findings under the SIJ provisions of the INA. We agree.

### A. *Applicable Legal Principles*

An unaccompanied child is subject to deportation unless granted permission to stay in the United States. Several provisions of the INA allow an unaccompanied child to stay in the United States. Here, as a human trafficking victim, Y.M. had been granted "Continued Presence" status, which suspends deportation proceedings for one year, and may be renewed on a yearly basis. Additionally, she was eligible to apply for a T visa which, if granted, would permit her to remain in the United States for up to four years and then apply for permanent residency.[11]

---

[11] Congress created T visa status to protect victims of human trafficking regardless of age. An individual may apply for T visa status if he or she is or has been a victim of a severe form of trafficking in persons. A T visa expires four years from the date of approval and may be extended if the individual's presence is necessary to assist in the investigation or prosecution of trafficking in persons. (8 U.S.C. § 1101(a)(15)(T)(i); 8 C.F.R. § 214.11(p)(1) (2012).)

Y.M. was also eligible to apply for SIJ status. Congress created this classification to protect abused, neglected, and abandoned unaccompanied minors through a process that allows them to become permanent legal residents. (*Perez-Olano, supra*, 248 F.R.D. at p. 265.) When an unaccompanied minor is a dependent of a state court because of maltreatment or the risk of maltreatment, SIJ status provides permanent immigration relief. (8 U.S.C. §§ 1101(a)(27)(J), 1232(d).) A minor who obtains SIJ status may become a naturalized United States citizen after five years. (*Zheng v. Pogash* (S.D.Tex. 2006) 416 F.Supp.2d 550, 554.)

An unaccompanied minor is eligible for SIJ status if he or she is under 21 years of age, unmarried, has been declared a dependent of a juvenile court in accordance with state law and is eligible for long-term foster care, and the juvenile court determines it would not be in the child's best interest to be returned to his or her country, or parent's country, of nationality or last habitual residence. (8 U.S.C. § 1101(a)(27)(J)(i)–(ii).) "Eligible for long-term foster care" means the juvenile court has determined that family reunification is no longer a viable option. (8 C.F.R. § 204.11 (2012).) A minor who is eligible for long-term foster case will normally be expected to remain in foster care until reaching the age of majority, unless adopted or placed in a guardianship. Adoption or the establishment of a guardianship will not disqualify a dependent minor from being classified as an SIJ. (*Ibid.*) While the minor's SIJ application is pending, the minor must continue to be dependent upon the juvenile court and eligible for long-term foster care. (*Ibid.*)

To apply for SIJ status, the applicant must submit documentary evidence of his or her age in the form of a birth certificate, passport, official foreign identity document issued by a foreign government, and one or more documents which include a juvenile court order showing that the court has found the minor to be dependent upon that court and is eligible for long-term foster care, and evidence of a judicial or administrative determination that it would not be in the minor's best interest to be returned to the country of nationality or last habitual residence of the minor or his or her parent or parents. (8 C.F.R. § 204.11(d) (2012).)

---

To apply, the individual must provide evidence demonstrating that the applicant is a victim of a severe form of trafficking in persons, is physically present in the United States on account of a severe form of trafficking in persons, complied with any reasonable request for assistance in the investigation or prosecution of acts of severe forms of trafficking in persons, or has not attained 15 years of age, and would suffer extreme hardship involving unusual and severe harm if he or she were removed from the United States. (8 C.F.R. § 214.11(d)(2)(iv)–(vii) (2012).)

B. *Analysis*

The record shows that Y.M. was subject to deportation proceedings. The ICE agent involved with Father's criminal case had granted Y.M. "Continued Presence" status in the country, but Y.M. was having difficulty completing her T visa application because of her disabilities. Y.M.'s counsel asked the juvenile court to make findings that would allow Y.M. to apply for SIJ status. The juvenile court found that Y.M. was not in imminent danger of deportation and declined to make findings that would allow Y.M. to apply for SIJ status.

█ Under federal law, an unaccompanied minor has the right to petition the juvenile court for findings under the SIJ statute.[12] (*Perez-Olano, supra,* 248 F.R.D. at pp. 264–265, 266; see 8 U.S.C. § 1101(a)(27)(J).) Because Y.M. was potentially eligible for SIJ status, she was entitled to a hearing where the juvenile court would determine whether findings required for SIJ status existed. (*Yeboah v. United States Dept. of Justice* (3d Cir. 2003) 345 F.3d 216, 223 [unaccompanied minor has the right to have his request for a dependency hearing considered in accordance with INS policy]; see *B.F. v. Superior Court* (2012) 207 Cal.App.4th 621, 629 [superior court has mandatory duty to make SIJ findings when an unaccompanied minor is eligible for SIJ status but does not fall within juvenile court jurisdiction]; *Matter of Jisun L. v. Young Sun P.* (N.Y.App.Div. 2010) 75 A.D.3d 510, 511 [905 N.Y.S.2d 633].) We find nothing in federal immigration law that permits a state juvenile court to determine which route, if any, an unaccompanied child or minor may explore to lawfully remain in the United States. Although the federal government will ultimately determine Y.M.'s immigration status, including her right to permanent residency, the juvenile court erred in declining to consider Y.M.'s request for SIJ findings.

---

[12] The Judicial Council of California has adopted form JV-224, Order Regarding Eligibility for Special Immigrant Juvenile Status, for mandatory use when a child requests SIJ findings. This form requires the following findings: "The child was found to be within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300 or 602. The child was declared dependent on the juvenile court of the county of *(specify)*: The child was legally committed to, or placed under the custody of, a state agency or department, or an individual or entity appointed by a state or juvenile court, on *(specify date)*: The child remains under this court's jurisdiction. [¶] . . . Reunification of the child with one or both of the child's parents was deemed not to be viable on *(specify date)*: This finding was made by reason of the abuse, neglect, or abandonment of the child or by reason of similar basis under California law. [¶] . . . It is not in the best interest of the child to be returned to his or her previous country of nationality or country of last habitual residence *(specify country or countries)*: or his or her parents' country or countries *(specify country or countries)*: It is in the child's best interest to remain in the United States."

### III. *Juvenile Court Abused Its Discretion by Denying Y.M.'s Petition to Terminate Reunification Services to Father*

In October 2010, after making a true finding on allegations of physical and sexual abuse by Father, the juvenile court ordered a plan of reunification services for Father. The juvenile court ordered there be no contact between Father and Y.M. In February 2011, DNA testing confirmed that Father had had sexual relations with then 15-year-old Y.M. In March, Father was arrested and incarcerated on federal charges of transporting a minor with the intent to engage in criminal sexual activity.

In August, Y.M. filed a petition under section 388 seeking termination of Father's reunification, citing his incarceration and lack of participation in his court-ordered case plan as changed circumstances. Y.M. said it was in her best interest not to reunify with Father because he had seriously sexually abused her. She further explained a finding that reunification with one or both parents was not viable due to abuse would allow her to apply for SIJ status. The juvenile court denied Y.M.'s petition.

■ Under section 388, subdivision (c), any party, including a dependent child, may petition the court to terminate court-ordered family reunification services. To terminate family reunification services before the applicable statutory time period has expired, the juvenile court must find by clear and convincing evidence that a change of circumstance or new evidence exists that satisfies a condition set forth in section 361.5, subdivision (b) or (e) justifying termination of court-ordered reunification services. (§ 388, subd. (c)(1)(A); rule 5.570(e)(3).) Alternatively, the juvenile court may find that the action or inaction of the parent has created a substantial likelihood that reunification will not occur, including, but not limited to, the parent's failure to visit the child or to participate regularly in court-ordered services. (§ 388, subd. (c)(1)(B); rule 5.570(e)(4).) The juvenile court must also find by a preponderance of evidence that reasonable services have been offered or provided. (§ 388, subd. (c)(3).)

■ Section 361.5, subdivision (b) provides that reunification services need not be offered to a parent under certain specified circumstances. (§ 361.5, subd. (b)(1)–(15).) As relevant here, under section 388, subdivision (c), the court may terminate reunification services when the evidence shows that the child has been adjudicated a dependent under section 300 as a result of severe sexual abuse to the child, and the court makes a factual finding it would not benefit the child to pursue reunification services with the offending parent. (§§ 361.5, subd. (b)(6), 388, subd. (c).) A finding of severe sexual abuse, for the purposes of this subdivision, may be based on, but is not limited to,

sexual intercourse, or stimulation involving genital-genital, oral-genital, anal-genital, or oral-anal contact, whether between the parent and the child or sibling, or between the child and another person with the actual or implied consent of the parent. (§ 361.5, subd. (b)(6).)

Section 388, subdivision (c) also allows a party to petition to terminate reunification services to a parent when that parent is incarcerated or institutionalized, and the court determines, by clear and convincing evidence, those services would be detrimental to the child. (§ 361.5, subd. (e).) "In determining detriment, the court shall consider the age of the child, the degree of parent-child bonding, the length of the sentence, the length and nature of the treatment, the nature of the crime or illness, the degree of detriment to the child if services are not offered and, for children 10 years of age or older, the child's attitude toward the implementation of family reunification services, the likelihood of the parent's discharge from incarceration or institutionalization within the reunification time limitations described in subdivision (a), and any other appropriate factors." (*Id.*, subd. (e)(1).)

We review the grant or denial of a petition for modification under section 388 for an abuse of discretion. (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71 [43 Cal.Rptr.3d 897]; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47 [82 Cal.Rptr.2d 426]; see *In re Angelique C.* (2003) 113 Cal.App.4th 509, 523 [6 Cal.Rptr.3d 395].) The abuse of discretion standard gives the court substantial latitude. However, the scope of the court's discretion is determined by the legal principles governing the subject of the action. A judicial determination that falls outside the applicable principles of law constitutes an abuse of discretion. (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119 [50 Cal.Rptr.3d 208].)

Here, the record shows that Father arranged for Y.M. to be abducted from her home in Guatemala and brought into the United States illegally. He forced Y.M. to have sexual relations with him " 'almost every single day.' " Father also arranged for Y.M. to have sexual relations with other men, and hit her when she objected. The juvenile court made true findings under section 300, subdivision (d). Thus the record clearly shows that Father's sexual abuse of Y.M. constitutes "severe sexual abuse" within the meaning of section 361.5, subdivision (b)(6).

To terminate previously ordered family reunification services under section 361.5, subdivision (b)(6), the juvenile court must also find that it would not benefit the child to pursue reunification services with the offending parent. The appellate court does not generally make implied findings. (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1825 [46 Cal.Rptr.2d 198].) However, here, ample evidence supports the finding it would not benefit Y.M. to

pursue reunification with Father. The result is obvious from the record. (*Ibid.*; *In re Andrea G.* (1990) 221 Cal.App.3d 547, 554–555 [270 Cal.Rptr. 534].)

Father abandoned Y.M. when she was an infant, and did not contact her until shortly before her 15th birthday. He then arranged for her abduction and illegal entry into the United States for sexual trafficking, and subjected her to physical, sexual and emotional abuse on an almost daily basis. He would not allow Y.M. to leave the home. Y.M. suffered a head wound during a violent altercation between Father and his brother-in-law. At the dispositional hearing on October 29, 2010, the juvenile court issued a no contact order prohibiting Father from any contact with Y.M., and ordered a plan of family reunification services. Father did not enroll in services until March 8, 2011. Later that day, Father was arrested and incarcerated on charges of transportation of a minor with the intent to engage in criminal sexual activity. If convicted, he would serve a mandatory minimum 10-year sentence and possibly a life sentence. Y.M. did not want to reunify with Father and refused to have any contact with him. Under these circumstances, the record clearly shows that Y.M. will not benefit from pursuing reunification services with Father. (§§ 388, subd. (c)(1)(A), 361.5, subd. (b)(6).) Alternatively, the record clearly supports a finding that Father's action and inaction created a substantial likelihood that reunification will not occur. (§ 388, subd. (c)(1)(B).) The record also shows that Father was offered or provided reasonable services. (§ 388, subd. (c)(3).)

We conclude the court abused its discretion when it denied Y.M.'s petition to terminate reunification services to Father under section 388, subdivision (c). The record clearly shows that reunification with Father is not viable due to his severe sexual abuse, and physical and emotional abuse, of Y.M.

#### IV. *Juvenile Court Did Not Abuse Its Discretion by Denying Mother's Section 388 Petition*

Mother contends the juvenile court abused its discretion when it denied her petition to return Y.M. to her care. Although seemingly inconsistent with her other appellate contentions, Y.M. joins in this argument.

Under section 388, a petitioner may ask the court to change, modify or set aside a previous order on the grounds of changed circumstances or new evidence. (§ 388, subd. (a).) The petitioner requesting the modification has the burden to show a change of circumstances or new evidence, and that the proposed modification is in the child's best interest. (*In re Jasmon O.* (1994) 8 Cal.4th 398, 414–415 [33 Cal.Rptr.2d 85, 878 P.2d 1297].) Generally, the

petitioner must show by a preponderance of the evidence that the child's welfare requires the modification sought. (Rule 5.570(e).)

We review the grant or denial of a petition for modification under section 388 for an abuse of discretion. (*In re Shirley K., supra,* 140 Cal.App.4th at p. 71; *In re Casey D., supra,* 70 Cal.App.4th at p. 47.)

To the extent the juvenile court had jurisdiction to make findings related to Mother's request to return Y.M. to her physical custody, see Discussion, part I.B., *ante,* we conclude that the juvenile court did not abuse its discretion when it denied Mother's petition. (§ 388.) There is ample evidence to support findings there would be a substantial danger to Y.M.'s physical health, safety, protection, or physical or emotional well-being were she returned home, and there are no reasonable means by which Y.M.'s physical health can be protected without removal from Mother's custody. (§ 361.5, subd. (c).)

The record shows that Mother said she left one-year-old Y.M. in the care of her maternal grandparents because Mother could not live with her boyfriend if she had a baby. Mother wanted Y.M. to return home to clean, cook and care for her younger siblings. She did not recognize the value of providing Y.M. with an education. The record does not indicate Mother recognizes Y.M.'s special needs. Y.M. said she was physically abused by Mother, who hit her and pulled her hair. The Consulate General of Guatemala stated that in view of Mother's circumstances, there was no guarantee Y.M. would receive appropriate care if reunified with her family in Guatemala.

Mother received money from Father shortly before Y.M. was abducted. Although Y.M.'s grandmother had identified the kidnapper, Mother did not contact the authorities to report her daughter's disappearance. One month after Y.M. was abducted, Mother telephoned Y.M. and asked her for money. Mother said she understood that Y.M. was working. The Consulate General of Guatemala recognized that Mother may have been complicit in Y.M.'s abduction, exploitation and human trafficking. Further, the repeated appearances of the paternal uncle who was involved with Y.M.'s abduction in Guatemala creates a substantial risk that Y.M. will be abducted again for human trafficking if returned to Mother's custody. Thus the juvenile court did not err when it denied Mother's request for custody.

## V. *Juvenile Court Did Not Err in Denying Y.M.'s Removal Petition*

Y.M. contends the juvenile court abused its discretion when it denied her petition seeking modification of the order placing her in a federal refugee

resettlement program. Y.M. objects to placement in a locked psychiatric facility. She argues the juvenile court was required to grant her petition to bring her placement into compliance with California law, which grants rights to children in foster care.[13] (§ 16001.9, subd. (a).)

■ The juvenile court does not have jurisdiction to remove a child from the custody of federal authorities or to change a child's placement without the consent of the federal government. (*Perez-Olano, supra,* 248 F.R.D. at pp. 264–265.) Here, Y.M. did not challenge the initial juvenile court order placing her in the custody of the federal agency, nor did she ask the juvenile court to seek consent from the federal agency to remove her from its program and place her in foster care in San Diego. In view of the posture of the case, we conclude that the juvenile court did not abuse its discretion when it denied Y.M.'s petition to remove her from the federal program.

■ Further, assuming without deciding that section 16001.9 applies after the juvenile court has transferred custody of the child to the federal government, Y.M. does not show on this record that placement in a locked psychiatric facility violated her rights under state law. Contrary to Y.M.'s assertion, a dependent child in the California foster care system may be placed in a locked facility if it is a community treatment facility. (§§ 16001.9, subd. (a)(12), 361.2, subd. (e)(5); see § 5150.) Federal law requires that an unaccompanied child in federal custody must be promptly placed in the least restrictive setting that is in the best interest of the child, considering danger to self, danger to the community and flight risk. (8 U.S.C. § 1232(c)(2).) "A child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." (*Ibid.*) In the absence of evidence to the contrary, we presume the federal officials in charge of Y.M.'s care and custody acted in accordance with their legal responsibilities. (*Jennings v. Mansfield* (Fed.Cir. 2007) 509 F.3d 1362, 1367.)

---

[13] In California, "as a matter of public policy, the state assumes *an obligation of the highest order* to ensure the safety of children in foster care." (§ 16000.1, subd. (a)(1), italics added.) Foster care homes must meet state safety standards. (Health & Saf. Code, §§ 1506, 1506.5; see Welf. & Inst. Code, § 361.21.) Children in state foster care in California have the right to contact family members, unless prohibited by court order, and social workers, attorneys, foster youth advocates and supporters, Court Appointed Special Advocates and probation officers; make and receive confidential telephone calls and unopened mail, unless prohibited by court order; and to have social contacts with people outside of the foster care system, such as teachers, church members, mentors, and friends. (§ 16001.9, subd. (a).) Further, a dependent child may not be placed in an out-of-state group home unless that facility meets requirements under the Interstate Compact on the Placement of Children (Fam. Code, § 7900 et seq.) and instate facilities or programs have been determined to be unavailable or inadequate to meet the child's needs. (§ 361.21; Fam. Code, § 7911.1.)

The record shows that the Agency could not maintain Y.M. in a family foster care home because of her severe behavioral issues. The Agency then placed her in a group home. There Y.M. became very aggressive and oppositional with staff and peers. She was involuntarily hospitalized. After her release from the hospital and placement in federal custody, Y.M. was described as assaultive, angry, defiant and noncooperative. She was placed on psychotropic medication. The federal agency placed her in a residential treatment center, where she gained privileges to leave the campus as her behaviors stabilized. Thus, on this record, Y.M. does not show that her placement violated her rights as a foster child under California law.

## DISPOSITION

The juvenile court's findings and orders terminating dependency jurisdiction and denying Y.M.'s petition seeking termination of reunification services to Father are reversed. The matter is remanded to the court with instructions to hold a new six-month review hearing under section 366.21, subdivision (e), and to promptly consider Y.M.'s request for Special Immigrant Juvenile findings under title 8 United States Code section 1101(a)(27)(J).

The court shall ensure the Agency prepares an updated report as required by sections 366.21, subdivision (c) and 366, including a report from the Consulate General of Guatemala about its investigation into Mother's alleged involvement in Y.M.'s abduction, and a report from all federal agencies involved in Y.M.'s care and placement. If Y.M. is still in federal custody in another state, the Agency's report shall also include the feasibility of initiating dependency proceedings through the Uniform Child Custody Jurisdiction and Enforcement Act.

The court shall exercise its discretion to make all appropriate findings under sections 366.21, subdivision (e) and 366. In making these findings, the court must be guided by concurrent jurisdiction principles, under which the court has broad powers to issue orders in Y.M.'s best interests, but is prohibited from modifying Y.M.'s current federal placement without the consent of the federal government.

In reversing and remanding, we do not intend to suggest that the court erred in determining it was in Y.M.'s best interest to place her in federal custody or that it must necessarily continue dependency proceedings beyond the six-month review hearing to promote Y.M.'s best interests. Rather these are decisions for the court to make with a full understanding of its jurisdictional authority.

The juvenile court's findings and orders denying Mother's petition to return Y.M. to her custody and Y.M.'s petition for removal from the federal program and return to San Diego are affirmed.

Benke, Acting P. J., and Nares, J., concurred.