Filed 7/24/14  In re A.T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.T., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,  Plaintiff and Respondent,  v.  M.T.,  Defendant and Appellant. | E060523  (Super.Ct.No. J242715)  OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lily L. Sinfield, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Jamila Bayati, Deputy County Counsel, for Plaintiff and Respondent.

1

Appellant M.T. (mother) appeals the denial of her Welfare and Institutions Code[1] section 388 petition, which requested reinstatement of reunification services with respect to her minor son A.T., the subject of this dependency proceeding. (§ 388, subd. (a)(1).) After denying the section 388 petition, the juvenile court proceeded to adjudicate section 366.26 issues, finding A.T. adoptable and there to be no applicable exception to adoption, and terminating parental rights. On appeal, mother's sole contention is that the juvenile court abused its discretion by denying her section 388 petition because she demonstrated changed circumstances and the requested modification was in the best interests of the minor. We find no abuse of discretion, and affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

On January 17, 2012, mother was arrested on suspicion of carjacking, felon in possession of a gun, and child endangerment. She was accused of interfering with the repossession of her vehicle by standing in front of the tow truck, which had already hooked up her vehicle and was in the process of driving away, and brandishing a handgun. According to a witness, during the incident, mother placed A.T.—then two years old—on the hood of the truck. When police arrived, mother was still standing in front of the truck, with the firearm tucked in her waistband at her back, under her shirt, and A.T. in her arms.

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise noted.

This incident was hardly mother's first contact with law enforcement; she has a lengthy criminal history dating back to 1999 charges of willful cruelty to a child. Later convictions include vehicle theft, forgery, false representation, drug offenses, burglary, receiving stolen property, and domestic battery. On January 11, 2012, less than a week before the carjacking incident described above, mother had been arrested on felony burglary and forgery charges.

Mother has a long history of substance abuse and mental illness. Although she has had periods of sobriety, she admitted to relapsing in September 2011, and having used methamphetamine as recently as a week prior to her arrest in January 2012. She is trained as an electrician, but since September 2011 she has been on disability, because her employer required her to obtain "mental clearance" in order to continue to work, and her psychiatrist would not clear her. She reported that she has been diagnosed with attention deficit hyperactivity disorder, posttraumatic stress disorder, intermittent explosive disorder, and bipolar disorder.

Although A.T. was initially placed with alternative caregivers by law enforcement, those arrangements were unstable, and San Bernardino County Children And Family Services (CFS) became involved. On January 31, 2012, A.T. was placed in foster care, pending assessment of potential placements with relatives or nonrelatives familiar with him. The dependency petition alleged failure to protect, based on the incident on January 17, 2012, as well as the history of substance abuse and domestic violence of both

3

mother and A.T.'s alleged father, R.H (father). [2] The petition further alleged no provision for support, based on mother's incarceration, and the circumstance that father's whereabouts were unknown at the time. Father was later located living out of state.

A.T. had previously been taken into CFS protective custody on November 16, 2009, a few weeks after his birth, when both mother and father were incarcerated for domestic violence. Mother successfully reunified with A.T. in that case, though father did not do so, and the child was returned to her custody and the matter dismissed on March 1, 2011. Additionally, in 1999, CFS initiated a dependency with respect to A.T.'s older half siblings, based on substantiated allegations of general neglect, including failing to seek medical attention for her children in a timely manner, leaving the children with no information regarding her whereabouts, and problems with substance abuse interfering with her parenting. In that case, the children were returned to the care of their father, but mother did not successfully complete reunification services.

An amended dependency petition, dated February 23, 2012, modified the allegations of the initial petition to reflect that father's whereabouts were no longer unknown, and to include the information he had previously failed to reunify with A.T. in an earlier dependency case, he had not seen A.T. since October 2010, and he had only limited telephone contact with him since. On March 15, 2012, the court found the allegations in the amended petition true as written, removed A.T. from parental custody,

---

[2] Mother and father married in March 2009, but separated in October 2009, several weeks before A.T.'s birth.

ordered that he remain in foster care, and ordered family reunification services for the parents, including supervised visits for mother upon her release from custody.

On May 10, 2012, CFS placed A.T. with a nonrelated extended family member, Mr. O., a placement that mother had endorsed.[3]  As part of a plea bargain to resolve the criminal charges arising from the January 17, 2012, carjacking incident, as well as the separate charges of burglary and forgery from her January  11, 2012, arrest, mother was sentenced to probation and time served, and released from custody in May 2012.

The six-month status review report, filed with the court on September 10, 2012, but dated by the social worker on August 27, 2012, recommended A.T. remain in the care of Mr. O., as well as continued reunification services for mother only, but not father.  The report noted certain concerns regarding mother's participation in services, including and especially mother's anger and ability to manage it appropriately.  Mother admitted she had anger issues, including "blackouts," and she was disruptive with service providers, often cursing and yelling, and causing safety concerns.  She was prescribed psychotropic medication, and acknowledged that she needed medication, but resisted medication monitoring.  She did demonstrate some progress with respect to development of her parenting skills, and had some positive visits with A.T.  Nevertheless, she also displayed her anger issues in several interactions relating to visitations with both Mr. O. and CFS staff, raising concerns about her mental stability.

---

[3] Mr. O. was familiar with A.T., because Mr. O.'s daughter and A.T.'s mother had been friends for many years.

The report also noted that A.T. appeared to be a happy and active toddler. He showed significant progress with respect to his delayed speech development, as well as behavioral issues related to limits and boundaries. In addition to his visits with his mother, he also had positive visits with one of his half brothers, and the half brother's father, with whom he appeared to have a strong bond.

In a September 17, 2012 supplement to the six-month status review report, the social worker informed the court that on September 4, 2012, mother violated her probation by testing positive for amphetamines, and she had been arrested and detained. The social worker also received a report from Mr. O. that mother had admitted to him that she was selling marijuana from her home during August 2012. Additionally, the social worker had learned mother was terminated from her outpatient substance abuse treatment as of August 10, 2012, due to "'no participation in services,'" and that she had displayed "hostile behavior," in addition to failing to accept accountability for past behavior and to "embrace treatment."

At the review hearing on September 17, 2012, the court ordered continued family reunification services for mother, terminated services for father, and added a psychological evaluation to the requirements in mother's case plan, over her objection.

In the 12-month status review report, CFS recommended termination of mother's services, and setting a section 366.26 hearing to establish a permanent plan of adoption for A.T. After violating her probation, mother had been sentenced on October 26, 2012, to a prison term of four years eight months, which with credit for time served gave her an anticipated release date of early December 2015. Mother had been incarcerated since her

6

arrest in September 2012, and had not visited with A.T. as a result. At the 12-month review hearing on April 11, 2013, the court agreed with CFS that mother had made "minimal" progress in family reunification services, and terminated those services. The court found no probability that A.T. would be returned to parental custody within the statutory time frames, and set a section 366.26 hearing to consider termination of parental rights.

On June 11, 2013, this court dismissed mother's writ petition, objecting to the setting of a section 366.26 hearing, pursuant to a "non-issue" letter filed by her appointed counsel.

The CFS section 366.26 report dated August 8, 2013, recommended termination of parental rights to permit A.T. to be adopted by Mr. O. The social worker found that Mr. O. and A.T. had bonded and demonstrated mutual affection and love for one another. A.T. seemed to view Mr. O. as a safe, parental figure, and he had been generally thriving in Mr. O.'s care. Mr. O. recognized that A.T. had behavioral issues that require "frequent redirection and attention," and was working appropriately with A.T. on impulse and temper control. Mr. O. was able to provide A.T. with a stable household, consisting of Mr. O., his long-time partner, Mrs. F. (with whom he had raised four children who are now adults), and Mrs. F.'s two granddaughters, aged four and less than one. The family lived in a three-bedroom home with a "landscaped front yard and a large backyard for the children to play," in a "well-kept residential community." Mr. O.'s amicable relationship with A.T.'s half brother's father is also noted, because it allows A.T. to see his half brother and the half brother's father, with whom A.T. had developed a parental

7

relationship, on a consistent basis; Mr. O. appeared committed to maintaining these relationships for A.T. The social worker observed that A.T. and the other two children in the home "are the focal point of family decisions and Mr. O. is committed to do whatever he needs to ensure the safety, permanency, and well-being of [A.T.] on a permanent basis."

On October 23, 2013, mother filed a section 388 petition, requesting reinstatement of family reunification services. The petition notes that mother, though still incarcerated, had taken classes in prison that allowed her to become a fire fighter, and thereby earn credits for an earlier release date. Instead of serving the anticipated sentence, she was scheduled for release on December 15, 2013. In addition, the petition indicates that while in prison, mother obtained a G.E.D. certificate, completed a parenting course and a stress and time management workshop, and was taking an anger management course. With respect to the best interests of the child, mother asserted that a minor is better off being raised by the mother, rather than a nonrelative extended family member, but acknowledged the argument that a nonrelative extended family member "is more of a sure thing." Nevertheless, she felt she had demonstrated her commitment to the return of her son, and reinstatement of services would give A.T. "an opportunity to be returned to his mother."

CFS opposed mother's section 388 petition, arguing it was not in A.T.'s best interest to reinstate family reunification services. The social worker noted that mother had previously received services, and shown no benefit from them. She had a history of poor decision making, leading to A.T. already being removed from her custody twice in

8

his four years of life. In the social worker's view, mother's repeated failure "to create and maintain stability for herself and the child" indicated that it would not be in A.T.'s best interests to remove him from the permanent, stable home that Mr. O. had been providing and would continue to provide. The social worker noted that Mr. O. was open to maintaining contact between A.T. and mother, if she "is stable and doing well."

Mother was released from prison on December 15, 2013. After her release, she visited with A.T. on several occasions. However, after the first visit, A.T. stated "'I want to stay with pipa'" ("pipa" refers to Mr. O.), and needed to be reassured that Mr. O. would be picking him up from daycare. CFS staff reported that mother was unable to control A.T.'s behavior or set boundaries for him, and did not demonstrate adequate supervision of A.T., instead engaging with friends and family while A.T. would run off without permission. Mr. O. reported that during a visit with mother on Christmas day, mother was "mainly on her phone" and "did not engage with the child much." In contrast, a daycare provider reported that A.T., who had initially come to her "not communicating well, with emotional problems as well as behavior problems," had thrived in the care of Mr. O. A.T. would "brighten right up" when he saw Mr. O., and he had developed into a "well adjusted" child, with "no behavior problems (outside of a normal 4 year old)." She expressed her view that "the love that is clearly shared between [Mr. O. and A.T.] is remarkable," and hoped that "they may continue together forever."

The court set a consolidated section 388 and section 366.26 hearing for January 27, 2014. At the hearing, the father of A.T.'s half brother testified regarding his observations of eight to 10 visits between A.T. and mother since her most recent release

9

from prison. He testified that A.T. is sometimes "hard to deal with," but felt that mother was "pretty good" about dealing with him. He acknowledged, however, that during the visits he would sometimes need to help out, for example, when she had her back turned or was paying attention to something else, and stated that "what she doesn't see, I catch."

Mother also testified at the January 27, 2014, hearing. She testified that A.T. calls her "mom," and jumps into her arms when he sees her, but also recognized that she needed to "build [her] bond back" with A.T. She described the services she had utilized in prison, including a "mail correspondence" anger management program, and a substance abuse course, which was also "book study" only, because attending meetings was incompatible with the fire fighting activities that reduced her sentence. She acknowledged that she has "trouble controlling [her] emotions" and planned to meet with a psychiatrist as part of her parole, though she had not yet done so. She insisted that she now understood that she previously had "a bad attitude," but she now was "willing to address the issues that I know are hindering me from being . . . the best possible mom I could be." She was living with a friend, and working in home health care for $800 per month, but planned to go "back to the union" to work as an electrician again once she had a car.

The final witness to testify at the January 27, 2014, hearing was the social worker for the case. She testified that she had been in contact with mother on several occasions since her release, and had not seen any marked change in mother's behavior. It was difficult for her to have discussions with mother, because mother "becomes very upset" and "starts yelling, screaming, hanging up the phone, similar to the past experiences I had

with her." With respect to A.T.'s safety, the social worker felt that mother's anger management issues were "the biggest concern," in addition to the substance abuse treatment and any necessary mental health treatment.

The court denied mother's section 388 petition, finding that mother had not demonstrated that the requested modification would be in A.T.'s best interests under the second prong of the section 388 analysis. The court then found A.T. adoptable and there to be no applicable exception to adoption, and terminated parental rights.

## II. DISCUSSION

Mother contends that the court abused its discretion by denying her section 388 petition. We find no abuse of discretion, and therefore affirm.

Section 388 "is an 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights. [Citation.]" (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528 (*Kimberly F.*).) "In order to grant a petition pursuant to section 388, there must be a substantial change in circumstances regarding the child's welfare and the requested modification of the prior order must be in the child's best interests. [Citation.]" (*In re Heraclio A.* (1996) 42 Cal.App.4th 569, 577.) Determining a child's best interests under section 388 involves a number of factors, including "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of the relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F.*, *supra*, at p.

11

532.)  We review the denial of a section 388 petition for abuse of discretion.  (*In re Y.M.* (2012) 207 Cal.App.4th 892, 918.)

It is doubtful that mother established even the first prong of the section 388 analysis, by proving changed circumstances.  Among other things, as of the January 27, 2014, hearing, mother had been out of jail for only a month and a half—less than half of the interval between her plea bargain in May 2012 and her violation of the conditions of her probation in September 2012 that led to her most recent period of incarceration.  During the month and a half since her release, mother had already displayed to CFS some of the same anger management issues that had plagued her before.  There is no evidence in the record that mother participated in random drug testing after her release from prison, and her attendance at 12 Step meetings was sporadic.  She had not yet completed even an initial meeting with a psychiatrist to address her mental health issues, though she had previously acknowledged that she needed medication to control them.  Her visits with A.T. after her release demonstrated a continuing lack of engagement with the child, and a lack of parenting skills.  In short, it is questionable that mother demonstrated she could now benefit from further reunification services, even though she had not benefitted from them previously, let alone that she was likely to benefit to the extent of being able to reunify with A.T. within the statutory time frames.

In any case, however, the court did not abuse its discretion in determining, even if mother had demonstrated changed circumstances, further reunification services would not be in A.T.'s best interests.  To the contrary, all of the factors articulated in *Kimberly F.* weigh in support of the trial court's decision.  The problems leading to the dependency

12

include mother's cornucopia of substance abuse, mental health, and emotional problems. Her lengthy criminal history includes domestic violence, child endangerment, and willful cruelty to a child, among other things. These problems led not only to general neglect of A.T., and possibly his behavioral issues and developmental delays, but also placed him in immediate potential of serious bodily harm on at least one occasion, during the January 2012 carjacking incident. To say that the problems leading to the dependency are serious is an understatement. Those problems have proven intractable over an extended period of time, and to the extent they have begun to be addressed, they are in the early stages of amelioration. Mother has expressed aspirations for being able to provide a safe and stable home for A.T., but has shown only minimal progress in that direction. She may have begun a "reformation," but it is hardly "completed." (See *Kimberly F.*, *supra*, 56 Cal.App.4th at p. 528.)

Additionally, the bond between mother and child has been strained, perhaps to the breaking point, by her absence due to incarceration for a substantial percentage of his life. In contrast, the record shows that A.T. and Mr. O. have developed a deep parental bond, dating back to even before the dependency. Mr. O. is ready, willing and able to continue to provide a safe, loving, stable, family home for A.T., as he has since A.T. was placed with him. To the extent there is a bond between mother and A.T., Mr. O. is open to maintaining it, so long as mother is stable and doing well.

Mother further argues that, in general, children benefit more from growing up with "natural parents," as opposed to foster care. This argument is without merit, for several reasons. Even assuming the truth of the basic principle asserted by mother, that generally

13

children do better with natural parents than they do in foster care, that does not demonstrate that placement with *this* natural parent, with her extensive problems, would be more beneficial to A.T. than foster care placement. Moreover, A.T. is not on track for long-term foster care: he is well on his way to being adopted by Mr. O., who shows every indication of being an outstanding permanent parent for the child.

In short, mother has demonstrated no abuse of discretion with respect to the denial of her section 388 petition.

### III.  DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST       
J.

We concur:

RAMIREZ
       P.J.

RICHLI
       J.