Filed 1/5/21  In re M.G. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re M.G., a Person Coming Under the Juvenile Court Law. | D077804 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>          Plaintiff and Respondent,<br><br>          v.<br><br>J.G.,<br><br>          Defendant and Appellant. | (Super. Ct. No. J520073) |

APPEAL from orders of the Superior Court of San Diego County, Carolyn M. Caietti, Judge.  Affirmed.

Jacques Alexander Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

J.G. (Mother) appeals from an order terminating her parental rights, contending the juvenile court erred when it concluded the beneficial parent-child relationship exception to adoption did not apply. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] Mother further challenges the denial of her motion pursuant to section 388 to return her son to her, or to order family maintenance services and reunification services, based on a change in circumstances. We conclude the court did not err, and therefore affirm the court's orders.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2019, the San Diego County Health and Human Services Agency (Agency) filed a petition under section 300, subdivision (e), alleging that in May 2019, then two-month old M.G. suffered severe physical abuse inflicted by I.G. (Father) and possibly another person. Specifically, the child suffered 13 arm and rib fractures in different stages of healing (suggesting multiple instances of abuse), an eye hemorrhage, multiple parallel linear bruises on his abdomen, and a liver laceration. The petition alleged that a child abuse medical expert opined that M.G. had sustained those injuries on at least three separate occasions. Although Mother and Father took M.G. to the hospital in June, Mother admitted they had not sought medical attention for his injuries during the past month.

In its detention report, the Agency stated that Mother told it that she and Father were M.G.'s primary caregivers and that she took him to the hospital because she observed blood on his eye and he was crying more than usual. Mother stated she did not understand how M.G. got hurt. Father stated M.G. could have been injured accidentally when he rolled on top of the

---

[1]    All statutory references are to the Welfare and Institutions Code.

child while they were sleeping or when M.G. fell out of bed. However, three days later, Father admitted to law enforcement officers that he smacked M.G. on the back of the head with his open hand; punched the child on his stomach with a closed fist; squeezed the child; and shook him. Father's admission of smacking, punching, squeezing, and shaking M.G. did not account for all of the child's injuries. At M.G.'s detention hearing, the court found that the Agency had made a prima facie showing in support of its petition and detained M.G. out of the home in foster care.

In its jurisdiction and disposition report, the Agency stated that Mother was having difficulty understanding how Father had injured M.G. She did not believe Father was responsible for injuring M.G., and instead believed the maternal grandmother may have injured M.G. when she had cared for him for short periods. Mother had supervised visits with M.G. and acted appropriately toward him during visits. Citing section 361.5, subdivision (b)(5) and (6),[2] the Agency recommended that the court not order reunification services for Mother and Father because of the severity of injuries inflicted on M.G. The Agency also was concerned that the parents

_____

2       Section 361.5, subdivision (b), provides an exception to the requirement that reunification services be provided to parents when a child is removed from their custody. The exception applies when the court finds by clear and convincing evidence "(5) [t]hat the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent or guardian[;]" or "(6)(A) [t]hat the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of . . . the infliction of severe physical harm to the child . . . by a parent or guardian . . . , and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent or guardian." Section 361.5, subdivision (b)(6)(C), provides: "A finding of the infliction of severe physical harm, for the purposes of this subdivision, may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body . . . by an act or omission of the parent or guardian . . . ."

3

had delayed seeking medical treatment despite seeing visible signs of injury.[3] They only took the child to the hospital after the paternal grandfather insisted they do so. In an addendum report, the Agency stated that Mother had completed a parenting class and was continuing her participation in child abuse classes. Although Mother stated she was learning to recognize the red flags for child abuse and had considered ending her relationship with Father, she admitted she loved Father and it would be difficult for her to move on. During her visits with M.G., she would take a teddy bear which played Father's voice for the child. At the October 2019 contested jurisdiction hearing, the court made true findings on the petition's allegations.

In its October 2019 disposition report, the Agency reported that Mother continued to claim she had not noticed M.G. cry in pain and denied that Father could have hurt the child. Mother stated she remained in a relationship with Father. Father recanted the statements he made to law enforcement officers and blamed the maternal grandmother for M.G.'s injuries. At the October contested disposition hearing, the court heard testimony from the psychologist who performed a psychological evaluation on Father. The psychologist explained that Father was abused during his childhood, he did not acknowledge full responsibility for causing M.G.'s injuries, and he remained uniquely dangerous to his own children due to "replaying" the trauma from his own childhood—meaning he would inflict abuse on his children. After learning that Father admitted to law enforcement that he punched, smacked, squeezed, and shook M.G., the

_____

[3] A medical expert explained some injuries would have been so painful that M.G. would have screamed in pain inconsolably while being dressed and moved around. This led the Agency to question Mother's ability to protect M.G. because she should have known of the child's pain and injuries while bathing and changing him.

psychologist agreed Father was trying to make himself "look good" to the psychologist by only admitting to squeezing the child too hard. Mother was present during this testimony.

The court also heard testimony that Mother had completed her parenting class program, she had finished nine child abuse classes, and she had supervised visits with M.G. three times per week. The social worker acknowledged there were no concerns regarding Mother's care of M.G. during the supervised visits. Although Mother was empathetic regarding M.G.'s well-being, the social worker testified that Mother was not empathetic about the abuse that M.G. suffered, she never seemed sad about it, and she minimized the abuse. Mother did not believe Father committed the abuse, she could not understand how the injuries occurred, and she took no responsibility. In closing arguments, the Agency's counsel emphasized that M.G.'s injuries were not caused by Father accidentally rolling over the child during sleep. Instead, counsel argued "that father beating a two-month-old was the problem. But by now, the mother should really know this, too. Her comments show she still doesn't believe he did the things he admitted to, despite overwhelming evidence that the abuse occurred and really only two people out there could have done this." Counsel further argued that Mother lacked insight and therefore could not be protective of M.G.

At the conclusion of the contested disposition hearing, the court declared M.G. a dependent of the court, ordered him placed in a confidential foster home, denied reunification services to Mother and Father pursuant to section 361.5, subdivision (b)(5) and (6), and ordered that Mother be allowed reasonable supervised visitation with M.G. The court also set a section 366.26 hearing to select a permanent plan for M.G. The court noted it was faced with a case where an infant sustained "severe injuries that were

5

inflicted on multiple days under circumstances where the child would have obviously been in pain, where he had visible injuries, and where there was blood on his pacifier, where he was not taken to the hospital that uncovered those injuries until the paternal grandfather insisted."

In its February 2020 section 366.26 report, the Agency recommended that the court terminate Mother and Father's parental rights and select adoption as M.G.'s permanent plan. The Agency believed that M.G. was generally and specifically adoptable and reported that his current foster caregivers wanted to adopt him. It reported that M.G. was doing well in his foster home. Mother had filed for divorce from Father and was no longer living with him. Mother was unable to explain the injuries that resulted in M.G.'s juvenile dependency. Mother consistently visited M.G. and the visitation logs prepared by the visitation monitor indicated she demonstrated a parental role during those supervised visits.[4] Despite positive interactions during these one-hour visits, the Agency concluded that the relationship that M.G. had with Mother did not rise to the level of a parent-child relationship. M.G., then 10 months old, had spent about seven months of his life outside of Mother's care. M.G. relied on his current caregivers to meet his physical and emotional needs and they were his primary parental figures. At supervised

---

[4]     There were eight visitation logs from December 3, 2019 to January 24, 2020. The visitation logs are preprinted forms with an entry titled "Demonstrates Parental Role." The visitation monitor can complete this section to show the parent "did well" or "needs help with" demonstrating a parental role. The monitor completed each of the logs indicating Mother did well during her supervised visits by providing all items needed for the visit; bringing a backpack with baby food, diapers, and snacks; changing the child's diaper; helping the child practice walking; preparing snacks for the child; and feeding the child. Each of these logs reflected a one-hour visit, but Mother also had some visits that were one and a half hours.

visits with Mother, M.G. did not show any distress on initial contact with, or separation from, Mother.

In its April 2020 addendum report, the Agency continued to recommend that the parental rights of Mother and Father be terminated and a permanent plan of adoption be selected for M.G. Mother stated that although she worked for the same company as Father, she had not had any contact with him. At that time, some of Mother's visits were virtual visits with M.G. (presumably because of the COVID-19 crisis). It was also reported that, during visits supervised by the caregiver, M.G. does not become distressed when Mother leaves, and he tends to crawl toward the caregiver when he is with Mother. The Agency reported that M.G. continues to rely on caregivers to meet his physical and emotional needs, and they provide him with a stable and safe environment.

In June 2020, Mother filed a section 388 petition to modify the court's October 2019 order. Mother requested that the court modify its prior order by returning M.G. to her care and ordering family maintenance services, or by ordering reunification services for her and expanding her visitation rights to unsupervised and/or overnight visits. She alleged there had been a change in circumstances since the prior order and that her requested order was in M.G.'s best interest. Regarding changed circumstances, Mother alleged that she was no longer in a relationship or living with Father and had filed for a divorce. She alleged she had attended 25 sessions of a child abuse group class and could not continue to attend that class due to her work schedule, but was now attending a different child abuse class.[5] Mother alleged she had

_____

[5] Mother explained during the hearing on her petition that she only attended two or three of these classes and stopped during the COVID-19 pandemic.

obtained full-time employment and taken other steps to become fully independent. Regarding M.G.'s best interest, Mother alleged she and M.G. had a clear bond and she had consistently visited him.

The Agency opposed Mother's section 388 petition. It believed that Mother's circumstances were changing, but had not yet changed. The Agency stated that Mother had not yet completed a child abuse program. She had not yet fully addressed empathy in her child abuse classes. Although Mother told the Agency that she had begun individual therapy the prior month, she could not identify the therapist by name. She had a new job after losing two prior jobs and lived with the maternal grandfather. During an in-person supervised visit, M.G. began to cry when Mother carried him and was inconsolable. At the end of the visit, M.G. let go of Mother's hand when he saw his caregiver and ran to the caregiver. Mother continued to wear her wedding ring, explaining she just liked to wear it. Mother stated she paid her cell phone bill and no longer shared a bank account with Father. Although she continued to work, Mother stated that she found it difficult to support herself and was unable to pay for continued child abuse classes. Mother stated she was only half-way ready to have M.G. back in her care.

In August 2020, after finding Mother had made a prima facie showing in support of her section 388 petition, the court held a combined hearing on her section 388 petition and the section 366.26 permanency planning issues. In addition to the Agency's reports, Mother's section 388 petition, and other documents admitted in evidence, the court also heard testimony from Rosa Pamatz, an Agency social worker; Mother; Valerie Padra-Najera, Mother's child abuse class therapist; and Wendy, M.G.'s caregiver.[6]

---

[6] Relevant portions of the witnesses' testimony is discussed *post*.

At the conclusion of the hearing, the court denied Mother's section 388 petition, finding that she had not shown changed circumstances or that her requested order was in M.G.'s best interest. Regarding the section 366.26 issues, the court found that the beneficial parent-child relationship exception did not apply, terminated Mother's and Father's parental rights, and selected adoption as M.G.'s permanent plan.

Mother timely appealed, challenging the court's orders denying her section 388 petition and terminating her parental rights.

## DISCUSSION

### I

### *Section 388 Petition for Modification*

Mother contends the juvenile court abused its discretion by denying her section 388 petition for modification because the evidence showed there had been a substantial change in circumstances since the October 2019 disposition order bypassing reunification services and it was in M.G.'s best interest to continue his relationship with her. We disagree.

#### A. *Applicable Law*

A parent may petition the juvenile court to change, modify, or set aside a prior order on the grounds of change of circumstance or new evidence.[7] The

---

[7] Section 388, subdivision (a), provides: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court or in which a guardianship was ordered pursuant to Section 360 for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition . . . shall set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction."

9

burden of proof is on the moving party to show both a change of circumstances and that the proposed modification is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); *In re G.B.* (2014) 227 Cal.App.4th 1147, 1157 (*G.B.*); *In re A.A.* (2012) 203 Cal.App.4th 597, 612 (*A.A.*); *In re Casey D.* (1999) 70 Cal.App.4th 38, 47 (*Casey D.*).) Typically, the parent must demonstrate changed circumstances by a preponderance of the evidence, but where reunification services were bypassed under section 361.5, subdivision (b)(5), as here, the burden of proof is clear and convincing evidence. (§ 388, subd. (a); California Rules of Court, rule 5.570(e)(7); see *G.B.*, *supra*, at pp. 1157-1158.)

The moving party must show *changed*, not merely changing, circumstances. (*Casey D.*, *supra*, 70 Cal.App.4th at p. 47.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] ' "[C]hildhood does not wait for the parent to become adequate." ' [Citation.]" (*Ibid.*)

Furthermore, "[w]hen a juvenile court bypasses reunification services due to a finding that a child suffered 'severe physical abuse' [citation], the focus of the dependency proceedings turns to the child's need for permanence and stability instead of family reunification." (*G.B.*, *supra*, 227 Cal.App.4th at p. 1157.) Accordingly, "at any hearing to consider a section 388 petition requesting reunification services[,] . . . a juvenile court may modify an order denying reunification services only if there is clear and convincing evidence that the services would be in the child's best interests, and only if it makes the same findings that would have been required to offer services at the

10

disposition hearing instead of bypassing services. [Citations.]" (*Ibid.*) Namely, "[o]nce severe abuse has been found, a court is '*prohibited* from granting reunification services "unless it finds that, based on competent testimony, those services are likely to prevent reabuse . . . or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." ' " (*Ibid.*)[8]

The determination whether to grant or deny a section 388 petition "is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. [Citations.]" (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416 (*Jasmon O.*); see also *In re Y.M.* (2012) 207 Cal.App.4th 892, 920 (*Y.M.*).) On appeal, a reviewing court will not disturb a discretionary decision by the juvenile court unless the determination is arbitrary, capricious, or patently absurd. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.) The appellant has the burden on appeal to affirmatively show that the juvenile court abused its discretion. (*A.A.*, *supra*, 203 Cal.App.4th at p. 612.)

B. *Analysis*

Mother argues she met her burden of establishing changed circumstances justifying a modification of the court's order bypassing her for reunification services. Mother cites evidence that since the court's October

---

8    Mother states the multi-factor test from *In re Kimberly F.* (1997) 56 Cal.App.4th 519 is "[o]ne standard approach in assessing the best interest prong of section 388." But *Kimberly F.* did not involve a situation where, as here, reunification services were bypassed, shifting the focus of the proceedings to the child's interests in permanency and stability. (*In re J.C.* (2014) 226 Cal.App.4th 503, 526-527 (*J.C.*).) Even if we were to consider the listed factors from *Kimberly F.*, we would not be persuaded to reach a contrary conclusion.

2019 order, she engaged in child abuse classes, was employed fulltime, and was gaining independence by filing for divorce from Father. Mother also argues she met her burden of proving modification of the order was in M.G.,'s best interest. We conclude there was no abuse of discretion.

The juvenile court did not abuse its discretion in denying Mother's section 388 petition because she failed to show changed circumstances. There is substantial evidence to support the court's finding that Mother showed, at most, changing circumstances and not changed circumstances. As discussed above, M.G. suffered severe physical abuse, including 13 arm and rib fractures, an eye hemorrhage, multiple parallel linear bruises on his abdomen, and a liver laceration. The fractures were in different stages of healing—indicating there were multiple separate instances of physical abuse—and were so serious the child would have been in excruciating pain and his suffering would be apparent. The bypass of services for Mother thus was grounded on the fact that she knew or should have known of the abuse yet delayed in obtaining medical treatment. Mother alleged she had participated in child abuse classes for six months of the 12-month course, and she testified about what she learned from the parenting course and child abuse program. Mother further alleged that she attended all visits with the child, which were positive. But Mother had already completed a parenting program prior to the disposition hearing, and she had completed approximately nine child abuse classes. Completing additional child abuse classes, and her re-enrollment in a similar program, does not constitute a change of circumstances, especially when this case involves severe physical abuse of an infant and Mother has failed to complete the program (including

12

crucial aspects of the program addressing insight and empathy).[9] Similarly, Mother's supervised visits with M.G., in which she acted appropriately toward him and brought appropriate supplies like snacks and diapers, did not constitute changed circumstances as she already had similar visits with M.G. before reunification services were bypassed. As the juvenile court noted, "nothing changed" in regard to the visitation.

Furthermore, the juvenile court was concerned that Mother knew or should have known about the abuse, she did not take measures to protect M.G., and she lacked insight in failing to obtain medical treatment despite his visible signs of injury. Although Mother acknowledged M.G. had been hurt, she had not used the word "abuse" in describing his injuries. There was little evidence that Mother had taken responsibility for her actions or failures to act that contributed to the dependency. The court expressed concern that Mother believed Father's claims that the injuries could have been sustained by accident, stating "that doesn't seem credible, it doesn't seem logical." Despite the fact that Mother heard extensive testimony regarding Father's extreme physical abuse during the course of the dependency action, at the section 388 hearing, Mother did not recall significant details regarding Father's admissions of deliberate abuse. The court could reasonably conclude that Mother remained in denial and, without a clear explanation of what occurred and the source of the child's injuries, "there is no reason to believe

---

9    Mother attended only the first half of the child abuse course and had not attended the second half that would have focused on insight and empathy—which, according to Padra-Najera (Mother's child abuse class therapist), are essential for a parent to protect a child from the type of abuse inflicted on M.G. Although Mother's participation in the first half of the classes had been above expectation, Padra-Najera testified that she had not seen Mother in six months and did not know her current state of mind.

further services will prevent her from inflicting or ignoring the infliction of similar injuries in the future." (*In re A.M.* (2013) 217 Cal.App.4th 1067, 1077-1078.) There was substantial evidence to support the court's conclusion that Mother had not gained sufficient insight and empathy, and Mother has not met her burden of establishing that services were likely to prevent reabuse. (*G.B.*, *supra*, 227 Cal.App.4th at p. 1157.) The court could reasonably infer that Mother had shown she was in the process of changing her ability to protect M.G., but had not yet shown she had changed her circumstances and was now able to protect him.

Mother's contention that she was gaining independence, by filing for divorce from Father, and obtaining employment, similarly does not establish the trial court erred in denying her section 388 petition. Mother had not yet finalized her divorce from Father. She continued to wear her wedding ring, maintained a family photograph on her cell phone that included Father, and had contact with him (including dinner) merely four months before filing her section 388 petition. This evidence supported an inference by the court that Mother had not yet ended her emotional connection with the man who had abused M.G. and posed a risk to him of future abuse. And although Mother alleged in her section 388 petition that she was prepared to become M.G.'s permanent caregiver, Mother told the Agency she was only half-way ready to become M.G.'s caregiver. Because Mother had recently obtained a new job after losing two prior jobs and was living with the maternal grandfather, the court could reasonably infer that she had not yet established a stable job or stable home in order to provide M.G. with the stability he needed.[10]

---

[10] Mother testified that she was not prepared to have M.G. in her care and had yet to look into arranging daycare for M.G. if he were returned to her care and she continued to work.

Even if Mother had demonstrated a substantial change in circumstances, she has not shown it would be in M.G.'s best interest to provide reunification services or return him to Mother's custody. As discussed above, because the court bypassed reunification services for Mother and Father, the focus shifted to M.G.'s need for permanency and stability, not family reunification. (*G.B.*, *supra*, 227 Cal.App.4th at p. 1157 [trial court is required not to order reunification services unless it finds that services were likely to prevent reabuse *or* "failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent"].)

At the section 388 hearing, there was substantial evidence showing that M.G.'s best interest was in pursuing the permanency and stability that adoption could provide him rather than in continuing a relationship with Mother—whether through returning him to her care or offering her reunification services and more liberal visitation. Pamatz, the Agency's social worker, testified that it was not in M.G.'s best interest to return to Mother's care. Mother had not yet explained or understood how M.G. could have sustained the severe injuries he suffered on multiple occasions or why she did not observe, and seek treatment for, his injuries earlier.

Mother also failed to establish M.G. was "closely and positively attached" to her as required to modify the prior order bypassing reunification services. Mother points to her testimony to show the child was bonded with her and the visits went well. However, there was also evidence that the child showed no distress when separated from Mother and, at some visits, he became very distressed after the caregiver walked away and the caregiver had to redirect M.G. to go with Mother. The child sought comfort with the caregiver, and was thriving in his current placement with caregivers who were providing him with a stable home. The foster parents were addressing

15

all of M.G.'s physical and emotional needs, and M.G. had shown significant improvement in their care. Of particular note, the foster parents were in child-parent psychotherapy with the child and were helping this very young child deal with his diagnosed post-traumatic stress disorder from the trauma he suffered.

The Agency opined that it was in M.G.'s best interest that the court terminate Mother's and Father's parental rights and select adoption as his permanent plan. M.G. was only two months old when he came to the Agency's attention and had spent most of his life out of Mother's care. M.G. looked to his foster parents as parental figures, and relied on them for safety and stability. In light of the evidence, the court did not abuse its discretion in concluding that Mother's requested order was not in M.G.'s best interest. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *G.B.*, *supra*, 227 Cal.App.4th at p. 1157; *A.A.*, *supra*, 203 Cal.App.4th at p. 612; *Casey D.*, *supra*, 70 Cal.App.4th at p. 47; *Jasmon O.*, *supra*, 8 Cal.4th at pp. 415-416; *Y.M.*, *supra*, 207 Cal.App.4th at p. 920.)

II

*Beneficial Parent-Child Relationship Exception*

Mother contends the juvenile court erred when it terminated her parental rights, asserting she established the beneficial parent-child relationship exception to adoption applied. (§ 366.26, subd. (c)(1)(B)(i).) We disagree with this assertion as well.

A. *Applicable Law*

"The section 366.26 hearing is a critical late stage in a dependency proceeding. The child has been under juvenile court jurisdiction for an extended period following the dispositional order, and the court has held one or more review hearings to consider a return to parental custody. (See

16

§ 366.21.)  At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child.  [Citation.] . . . If adoption is likely, the court is required to terminate parental rights, unless specified circumstances compel a finding that termination would be detrimental to the child.  (§ 366.26(c)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 53[ ] [(*Celine R.*)].)"  (*In re S.B.* (2009) 46 Cal.4th 529, 532, fn. omitted.)

Mother invokes the beneficial parent-child relationship exception to adoption, which applies if "termination would be detrimental to the child" because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."[11] (§ 366.26, subd. (c)(1)(B)(i).)  In making the determination of whether the beneficial parent-child relationship exception applies, the juvenile court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 397 (*Anthony B.*).)  To establish the exception, a parent "must do more than demonstrate 'frequent and loving contact' [citation], an emotional bond with the child, or that the parents and child find their visits pleasant.  [Citation.]  Rather, the parent[ ] must show that they occupy 'a

_____

[11]     Mother does not rely on any other exception.  Although Mother has another child (a 10-year-old daughter) from a different father than M.G., she told the Agency that she had lost custody of her other child in a family court proceeding and there is no evidence that M.G. has a relationship with this sibling.

parental role' in the child's life. [Citation.]" (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108.) Such "a relationship characteristically aris[es] from day-to-day interaction, companionship and shared experiences." (*Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) "It is not enough to show that the parent and child have a friendly and loving relationship." (*J.C.*, *supra*, 226 Cal.App.4th at p. 529.) Moreover, "[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*Anthony B.*, *supra*, 239 Cal.App.4th at p. 395.)[12] Under the substantial evidence standard of review, we consider the evidence in the light most favorable to the court's order, draw all reasonable inferences in support of the court's findings, and disregard all contrary evidence. (*S.B.*, *supra*, 164 Cal.App.4th at pp. 297-298; *Casey D.*, *supra*, 70 Cal.App.4th at p. 53.) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason, and, in so doing, we do not substitute our view for that of the juvenile court. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)

---

[12]     The standard of review that applies to the beneficial parental relationship exception to adoption is currently pending before the California Supreme Court. (*In re Caden C.* (2019) 34 Cal.App.5th 87, 106, review granted July 24, 2019, S255839.) Pending further guidance, we apply the standard described herein.

B. *Analysis*

Mother claims she visited consistently with M.G., her relationship with the child was parental in nature, and it would be detrimental to M.G. to sever that relationship. At a minimum, she claims, the juvenile court should have ordered legal guardianship for the child rather than adoption.

It is undisputed that Mother maintained regular contact and visitation with M.G. and therefore met the first prong of the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i) ["parents have maintained regular visitation and contact with the child"].) Thus, the issue before us is whether Mother met her burden with regard to the second prong—whether she had a beneficial parental relationship with M.G. that "is sufficiently strong that the child would suffer detriment from its termination." (*In re Grace P.* (2017) 8 Cal.App.5th 605, 613.)

The record shows that Mother had a positive and loving relationship with M.G., and the child appeared to enjoy his visits with Mother. Nevertheless, the court could reasonably find that Mother's relationship with M.G. was not parental in nature but rather, more akin to a friendly visitor. For the majority of M.G.'s life, the child did not live with Mother or rely on her to meet his daily needs. He was only two months old when he was removed from his parents' custody and looked to his foster parents to meet his physical and emotional needs. Although Mother continued to have contact with M.G. during the dependency proceeding, she never progressed to unmonitored visitation. Under such circumstances, where the parent has not had custody of the child throughout the dependency proceedings and has not advanced beyond supervised visitation, the parent-child bond is difficult to establish. (*Casey D., supra,* 70 Cal.App.4th at p. 51.) The court reasonably found that the relationship formed during their limited supervised visitation

19

was not a parental relationship that warranted delaying M.G.'s adoption, but rather one of a friendly visitor or friendly nonparent relative. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) Although Mother cites evidence or inferences therefrom that would have supported a contrary finding, we are required to disregard these contrary findings under the applicable substantial evidence standard of review.[13]

Even assuming that Mother demonstrated a beneficial parental relationship with M.G., she has not shown such a relationship "outweigh[ed] the well-being [M.G.] would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; § 366.26, subd. (c)(1)(B)(i).) Pamatz testified that based on M.G.'s young age, good health, and temperament, there was a very high likelihood that he would be adopted, and his foster parents were fully committed to adopting him. During the social worker's observation of about eight visits between Mother and M.G., he did not show any distress at the end of his visits with Mother. By contrast to his easy separation from Mother, he was distressed when separating from his foster parent and attempted to return to her rather than Mother, requiring redirection. And as noted, Mother never progressed

---

[13] Mother emphasizes that the visitation logs reflect she demonstrated a parental role. (See fn. 4 *ante* [describing visitation logs].) But the juvenile court also heard testimony that Mother did not fulfill a parental role within the meaning of the beneficial parent-child relationship exception to adoption. Pamatz testified that M.G. looked toward his caregivers, and not Mother, for his physical and emotional needs for food, care, comfort, affection, safety, and stability. Furthermore, Pamatz testified that Mother's relationship with M.G. was not parental in nature, but instead that of a friendly visitor. " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Stephanie M.*, *supra*, 7 Cal.4th at p. 319.)

beyond supervised visitation. The court thus could conclude that M.G.'s primary attachment was to his foster parent, not Mother, and that any relationship with Mother was not outweighed by the security of a permanent placement. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622-623 ["While the weekly two-hour visits between K.P. and his mother may have been pleasant for both parties, there was no evidence in the record (beyond [mother's] stated belief) that termination of the parent-child relationship would be detrimental to K.P. or that the relationship conferred benefits to K.P. more significant than the permanency and stability offered by adoption"].)

Furthermore, Mother's failure to fully acknowledge and accept responsibility for M.G.'s severe physical abuse, combined with the instability in her living situation and work history, weighed against maintaining M.G.'s relationship with her. The court could reasonably conclude that Mother failed to demonstrate that she could provide M.G. with the stability he needed, as well as protection from child abuse, and that adoption could instead provide him with that stability and protection. Under these circumstances, severance of M.G.'s relationship with Mother would not deprive him of a substantial, positive emotional attachment such that he would be "greatly harmed." (*Anthony B.*, *supra*, 239 Cal.App.4th at pp. 394-395.) The juvenile court did not abuse its discretion in concluding that termination of Mother's parental rights would have no detrimental impact on the child. (*J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531; *Anthony B.*, *supra*, 239 Cal.App.4th at p. 395; *Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)

Mother also contends a permanent plan of legal guardianship would have been more appropriate for M.G. Under section 366.26, however, the statutory preference is to terminate parental rights and order the child placed for adoption. (§ 366.26, subd. (b)(1).) "The Legislature has thus

determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*Celine R.*, *supra*, 31 Cal.4th at p. 53.) We are not persuaded by Mother's argument that the preference for adoption is overcome simply because she has visited with the child and she believes he would receive some benefit from having an ongoing relationship with her.

In sum, we conclude Mother has not met her burden of showing that the juvenile court erred in finding that the beneficial parent-child relationship exception did not apply to preclude termination of her parental rights.

## DISPOSITION

The juvenile court's orders are affirmed.


GUERRERO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


DATO, J.

22