Filed 9/3/21  In re D.D. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re D.D. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>L.D.,<br><br>    Defendant and Appellant. | G059970<br><br>(Super. Ct. Nos. 19DP0601, 19DP0602, 19DP0603)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Law Offices of Vincent W. Davis & Associates and Vincent W. Davis, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

*        *        *

In July 2018, the police arrested L.D. (mother) for endangering her children: Emily (age 2); Christopher (age 8), and Dylan (age 10). The Los Angeles Department of Children and Family Services (DCFS) took the children into custody. The juvenile court declared the children dependents and ordered reunification services. The matter was transferred to Orange County. Dylan and Christopher were placed with their maternal grandmother (MGM) and Emily was placed with extended family members.

In August 2020, the juvenile court terminated mother's reunification services and set a permanency planning hearing. (Welf. & Inst. Code, § 366.26.) [1] Mother did not challenge the rulings in a writ proceeding.

In January 2021, just prior to the section 366.26 hearing, mother filed a petition to modify the prior orders. (§ 388.) The court summarily denied the section 388 petition, found the children adoptable, found the beneficial relationship exception to the termination of parental rights did not apply, and terminated parental rights.

Mother argues the court erred by summarily denying the section 388 petition and by finding the benefit exception did not apply. We affirm the court's orders.

I

FACTS AND PROCEDURAL BACKGROUND

On July 21, 2018, mother and her children were living in a recreational vehicle (RV). Mother parked the RV across the street from a restaurant, where she was going to have dinner with a man whom she had met online. Mother left the children alone in the RV, telling them she would return soon. After mother had dinner with the man, she went to his house to have sex in exchange for money. Mother called the police reporting the man had assaulted, raped, and robbed her.

_____

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

2

The next day, police learned mother had three children. Initially, mother claimed her children were being cared for by her sister. However, mother eventually admitted the children were not being supervised. The police went to the RV and found Emily in a soiled and crusty diaper. The police noted: the RV was filthy and unsanitary; the sink was filled with trash and dirty dishes; the RV had no power and was not connected to any utilities; and there was no food accessible to the children. DCFS was notified and took the children into protective custody.

*Jurisdiction and Disposition Proceedings*

In September 2018, DCFS filed a dependency petition alleging mother was an abuser of alcohol and marijuana. DCFS alleged mother left the children in a dangerous situation and had done so on prior occasions. Mother admitted the children were often made to "take care of themselves" while she recovered from daily hangovers (there were numerous prior DCFS investigations dating back several years).

In November 2018, the juvenile court declared the children dependents. The court ordered family reunification services, including substance abuse treatment and testing for mother, a 12-step program, parenting courses, and individual counseling. The court ordered monitored visitations with the children.

*Six-Month Review Hearing*

In May 2019, the juvenile court conducted a six-month review hearing.[2] (§ 366.21, subd. (e).) DCFS noted mother was making efforts on her case plan but was still testing positive for marijuana. DCFS reported mother was inappropriate during her

---

[2] Many of the hearings were continued past their normal time frames for various reasons. The later continuances were primarily related to the COVID-19 pandemic.

visitations (by discussing the dependency case with the children) and the circumstances had generally not changed since the prior hearing.

The juvenile court noted mother was now residing in Orange County and had just enrolled in parenting classes. The court was unaware of mother's progress in her mental health treatment plan. Mother's contacts with the social worker were inappropriate, which led DCFS to have concerns regarding her mental health. The court also noted mother's reported inappropriate behaviors during monitored visitations. The matter was later transferred to Orange County.

*12-Month Permanency Hearing*

In September 2019, the juvenile court conducted a 12-month permanency hearing. (§ 366.21, subd. (f).) The Orange County Social Services Agency (SSA) filed a 36-page status review report.

SSA reported the children were fathered by different men and Christopher's father was recently deceased.[3] Mother had participated in a substance abuse program and had completed a parenting education program. Mother had consistently complied with drug testing and had negative results, except for marijuana. Dylan and Christopher had been placed with MGM; Emily had been placed with a foster couple (extended family members). The children were doing well in their respective placements. Mother's visitations had recently been liberalized to include unsupervised visitations.

*18-Month Permanency Review Hearing*

In June and July 2020, the juvenile court conducted an 18-month permanency review hearing. (§ 366.22.) SSA filed an 87-page status review report, and

---

[3] The two remaining fathers have never been a part of the dependency proceedings.

11 addendum reports. SSA recommended the court terminate reunification services and schedule a permanency planning hearing. (§ 366.26.)

SSA reported mother did not demonstrate an ability to control her impulses and provide a stable living environment for the children. Mother's visitations had returned to monitored visitations. During visitations, mother repeatedly talked to the children about coming home to live with her. Mother had participated in multiple substance abuse treatment programs but did not receive a certificate of completion.

The juvenile court found mother continued to exhibit impulse control issues and mental instability. The court found mother had broken "100 percent of the . . . visitation parameters" which led to the termination of in-person visitations. The court found "the children cannot be safely returned and maintained in mother's care." The court terminated reunification services and set a section 366.26 hearing. Mother did not challenge those orders.[4]

*Intervening Restraining Order*

In September 2020, mother reported to DCFS that Dylan had sent her a message that MGM had abused him. Dylan and Christopher denied these accusations. Mother went to MGM's home for an unmonitored visitation while MGM was at work. Mother had also gone to the boys' school, but the staff would not allow her to pick up the children.

In October 2020, mother told her counselor "the children were Utopian and needed to be freed." Mother texted the social worker: "I won't follow rules that ARE WRONG!!! [¶] I will go see my kids bc [*sic*] it's the right thing to do[.] [¶] You are on the wrong side of history. Unconsciousness is the old world. There is no need to

---

[4] "All court orders . . . made at a hearing in which a section 366.26 permanency planning hearing is set must be challenged by a petition for extraordinary writ." (*In re Merrick V.* (2004) 122 Cal.App.4th 235, 247.)

'protect' my children that's why I will go see them." The juvenile court issued a restraining order protecting the children from mother with limited visitation. Mother later told the court: "I will not follow rules that tell me to break the bond and connection with my children."

In November 2020, mother broke into MGM's home when the family was out to dinner. Mother climbed up a tree and entered the home. Christopher found mother hiding in the bathtub/shower and ran out yelling there was a ghost. The police eventually arrived and arrested mother for violating the restraining order.

*Permanency Planning Hearing*

In January 2021, the juvenile court presided over a permanency planning hearing. (§366.26.) SSA filed a 224-page report and a 30-page addendum report. SSA recommended the court find each of the children adoptable and terminate parental rights. (§ 366.3.)

The juvenile court summarily denied mother's section 388 petition for modification. After hearing testimony, the court found the children adoptable, found none of the statutory exceptions to the termination of parental rights applied, and terminated mother's parental rights (the witness' testimony and the court's rulings will be covered in greater detail in the discussion section of this opinion).

II

DISCUSSION

Mother argues the juvenile court erred: A) by denying her December 2020 section 388 petition without an evidentiary hearing; and B) by finding the beneficial relationship exception to the termination of parental rights did not apply.

6

*A.  Summary Denial of Section 388 Petition*

"The purpose of the California dependency system is to 'provide maximum safety and protection for children . . . and to ensure the safety, protection, and physical and emotional well-being of children who are at risk . . . .'  [Citation.]  The dependency system is child-centered and is designed to protect the child, reunify the family where safe for the child and find a permanent home for the child when reunification is not possible.  Its guiding light is the child's best interests."  (*In re Y.M.* (2012) 207 Cal.App.4th 892, 913; see § 300.2.)  If reunification is not possible and the juvenile court ceases reunification services, the focus of the proceedings "'shifts to the needs of the child for permanency and stability.'"  (*In re Celine R*. (2003) 31 Cal.4th 45, 52.)

*1.  Legal Principles Governing Section 388 Petitions*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child.  [Citation.]  A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should be liberally construed in favor of granting a hearing to consider the parent's request."  (*In re Zachary G*. (1999) 77 Cal.App.4th 799, 806.)

"However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition.  [Citations.]  The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition."  (*In re Zachary G*., *supra*, 77 Cal.App.4th at p. 806.)

"The juvenile court's determination to deny a section 388 petition without a hearing is reviewed for abuse of discretion.  [Citations.]  We must uphold the juvenile

7

court's denial of appellant's section 388 petition unless we can determine from the record that its decisions "'exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"" (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) "An abuse of discretion [is] . . . an arbitrary, capricious or patently absurd determination." (*In re Marcelo B.* (2012) 209 Cal.App.4th, 635, 641-642.)

### 2. Relevant Proceedings

A few days before the section 366.26 hearing, mother filed a petition for modification. (§ 388.) Mother sought to change the juvenile court's prior orders and make new orders to: "1) Stop the .26; 2) Reinstate reunification services; 3) Increase Mother's visitation; and 4) Return kids to mother." Mother attached exhibits. Mother also averred in a declaration: "I keep growing every day and I plan to continue my growth as I am in school for psychology and hypnotherapy and I'm writing a book on communication."

At the start of the section 366.26 hearing, the court considered mother's section 388 petition. SSA argued mother was relying on the same evidence presented at the prior hearing: "It is identical in every single way. It is identical in the individuals identified; it's identical in the letters that are presented; it's identical in the information that is contained within those letters." Children's counsel also argued mother's exhibits, except for her declaration, predated the 18-month review hearing. Mother's counsel argued "there has been some change." Counsel argued mother "has stopped smoking marijuana . . . and she's currently being treated by a psychiatrist and is on psychiatric medication, including a mood stabilizer."

The juvenile court ruled:

"The court is keenly aware of the rule of liberality that applies in the instruction of a 388 in terms of analyzing whether a prima facie case has been set forth.

8

"The court obviously, since we're dealing with a change of circumstances, necessarily must evaluate this in terms of a measuring period.

"The court certainly is aware that this matter was litigated at the hearing in which services were terminated.

"The references in mother's declaration and the supporting documents with reference to that do indeed recapitulate a number of particular issues that certainly predate the termination of services."

After quoting several sentences from mother's declaration the court stated:

"In reading mother's declaration and reviewing the exhibits that she has attached . . . it is indeed, as counsel has pointed out, a recapitulation of what has been previously presented. [W]hat is readily apparent in reading the declaration and considering the exhibits is that it would appear that mother's fundamental approach is much the same as it was at the previous litigated matter.

"And even liberally construing mother's 388 . . . . The court, even given the liberality of construction . . . is going to find that the prima facie case has not been set forth, and the court is going to deny the 388 for failure to make a prima facie showing."


*3. Analysis*

Citing two opinions, mother argues: "The standard of review for a denial of a petition without a hearing is *de novo* review." We disagree. The two opinions confirm the correct standard of review is abuse of discretion. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 459-460; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1416.)

In the case of *In re Angel B.*, a mother petitioned a juvenile court to modify a prior order, and the court denied the section 388 petition without a hearing. (*In re Angel B.*, *supra*, 97 Cal.App.4th at pp. 459-460.) On appeal, mother argued "the juvenile court violated her constitutional rights by denying her request for a hearing" and further argued "the court should have granted her either supervised custody or reunification

services." The Court of Appeal stated it would "review such a summary denial for abuse of discretion [citation], and resolve the constitutional issue as a matter of law." (*Id*. at p. 460.) The appellate court found "the statutory scheme itself is constitutional because of its many safeguards." (*Id*. at p. 461.) And as far as the merits of the mother's claims, the Court of Appeal found "the juvenile court did not *abuse its discretion* by denying the section 388 petition with no hearing." (*Id* at p. 465, italics added.)

Similarly, in the case of *In re Jeremy W*., a mother petitioned a juvenile court to modify a prior order, and the court summarily denied the section 388 petition without a hearing. (*In re Jeremy W*., *supra*, 3 Cal.App.4th at p. 1412.) Based on the facts of the case, the Court of Appeal concluded the juvenile court "*abused its discretion* in denying [mother] a hearing on her section 388 motion to set aside its earlier order[.]" (*Id*. at p. 1413, capitalization & partial italics omitted.)

Mother does not appear to be challenging the constitutional framework of section 388. Therefore, we will review the juvenile's court's summary denial of mother's section 388 petition for an abuse of discretion. (See *Angel B*., *supra*, 97 Cal.App.4th at pp. 459-460; see also *Jeremy W*., *supra*, 3 Cal.App.4th at p. 1416.)

Based on the mother's section 388 petition, the juvenile court did not find a change in circumstances since its prior rulings. The court reviewed the pertinent documents and was keenly aware of the underlying facts of the case. As the court observed, virtually all the exhibits submitted by mother in support of the modification petition predated the prior orders of the court. The only significant "changes" noted by mother's counsel in his argument were that mother had recently stopped using marijuana and was on psychiatric medications; however, mother did not make those averments in her declaration. (See *In re Zeth S*. (2003) 31 Cal.4th 396, 414, fn. 6 ["It is axiomatic that the unsworn statements of counsel are not evidence"].)

Prior to its ruling, the juvenile court summarized the relevant legal principles under section 388. The court also summarized its legal analysis, which was

based on the appropriate law and the relevant evidence before the court. The court plainly did not approach its decision in an arbitrary or capricious manner. In short, while we recognize other courts may have elected to conduct a hearing, or may have come to a different decision, we cannot say this court's ruling was beyond the bounds of reason. Thus, we affirm the court's summary denial of mother's section 388 petition.

Mother also argues: "In deciding whether to grant a hearing on a section 388 petition, the juvenile court is to liberally construe the petition in favor of granting a hearing to consider the petitioner's request. [Citation.] If the petition presents *any evidence a hearing would promote the best interests of the child*, the court must order a hearing." (Italics added.) We disagree.

A petitioner needs to make a prima facie showing of *both elements* under section 388. (*In re Zachary G.*, *supra*, 77 Cal.App.4th at p. 806.) That is, the petitioner must make a prima facie showing of changed circumstances "*and* the proposed change would promote the best interests of the child," otherwise, "the court need not order a hearing on the petition." (*Ibid*., italics added.)

Here, the court determined mother did not make a prima facie showing of changed circumstances. Even if we assume mother made a prima facie showing that "a hearing would promote the best interests of" her children, mother would not have satisfied both of the required elements in order to trigger a hearing under section 388.

## B. Beneficial Relationship Exception to the Termination of Parental Rights

At the permanency planning hearing, the juvenile court determines a permanent plan for the child, and may order one of three alternative plans: adoption, guardianship, or long-term foster care. (§ 366.26, subd. (b); see *In re J.C.* (2014) 226 Cal.App.4th 503, 528.) "'[T]here is strong preference for adoption over the alternative permanency plans.'" (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 394-395.)

11

Generally, if the juvenile court finds the child adoptable the court must terminate parental rights. "[T]o avoid termination of parental rights and adoption, a parent has the burden of proving, by a preponderance of the evidence, that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, . . . apply." (*In re Anthony B.*, *supra*, 239 Cal.App.4th at pp. 394-395.)

### 1. *Legal Principles Regarding the Beneficial Relationship Exception*

Under the benefit (or parental bond) exception, a parent is required to show "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C*. (2021) 11 Cal.5th 614, 631 (*Caden C.*).)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"As to the second element, courts assess whether 'the child would benefit from continuing the relationship.' [Citation.] Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

As to the first two elements, the substantial evidence standard of review applies. "The determination that the parent has visited and maintained contact with the child 'consistently,' taking into account 'the extent permitted by the court's orders'

[citation] is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.)

"The third element—whether termination of parental rights would be detrimental to the child—is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

"Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. The decision is not the same as a determination whether to transfer the child from the custody of one caregiver to another, but it does require assessing what the child's life would be like in an adoptive home without the parent in his life. [Citation.] The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision— whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

## 2. *Relevant Testimony*

At the section 366.26 hearing, mother called five witnesses: S. Bugarin (the SSA social worker), Dylan, Christopher, Emily, and mother.

Bugarin testified Dylan was "parentified," meaning he had assumed the role of a parent by attempting to redirect mother when she violated the rules during visitations. Bugarin said Dylan loved his mother, but he was very affected by her breaking into MGM's home. Bugarin let Dylan "know that it was okay if he wanted to go through legal guardianship, and he said he wanted to be adopted." Bugarin did not know of any benefits to Dylan in keeping a relationship with his mother. Bugarin said Dylan would be sad, but he has a lot of support "as well as he has a loving home where he's at right now."

Bugarin testified Christopher understood the difference between legal guardianship and adoption. Christopher has "expressed a lot of anxiety, and has verbalized that he does not want to return to the mother's care, as grandma . . . will take him to school on time. He's thriving in placement. He's doing very well there, and he has continued to express that he wants to be adopted by the grandmother."

Bugarin testified the termination of parental rights would not be detrimental to Emily, who had been in a prospective adoptive placement for more than half of her life. Emily refers to her caregivers as "mommy" and "daddy." Bugarin opined Emily had essentially no emotional bond with mother.

Dylan was asked (over a video call) if he would still want to be adopted if it meant he would never see his mother again. Dylan vacillated and became emotionally upset. After a break in the proceedings, and a further explanation by the court, Dylan said he would choose adoption. Christopher testified he believed his mother "is in a state where she's mentally ill, and I don't think she should have custody of us." Christopher said, "I feel like I have perfect structure. Like, I have a set schedule. And I also feel like I'll get the right education. Like, with mom, I think she didn't care about my education,

14

but grandma really does.  And she really cares, so that's why.  And I feel like I'll get the right education and . . . that I know that she's always going to tell the truth."  Emily appeared on a video call with her prospective adoptive father, but the parties agreed she was not qualified to testify as a witness.

Mother testified she was close to each of her children.  As to Dylan, mother said, "He feels loved and deeply accepted and celebrated for who he is.  Dylan shares things with me that he doesn't feel comfortable sharing with anyone else."  Mother testified, "Christopher, I think, is very brainwashed by my mother."  When asked how Emily would react to not seeing her in the future, mother said, "It's going to be absolutely devasting to her and to me.  But to her, to my kids, that's one of the things that's so heartbreaking, is they're really suffering.  They really want to see me.  Going to play with my children in a park is not going to hurt anyone."

### 3.  The Juvenile Court's Rulings

The juvenile court found SSA had met its burden and established by clear and convincing evidence each of the children was generally and specifically adoptable.  The court noted the burden now shifted to the mother to establish one of the exceptions to the termination of parental rights and adoption applied.  After argument, the court announced its ruling concerning the benefit exception:

"The court looks at, amongst other things, the age of each child, the portion of each child's life spent within the parents' custody, the positive or negative effects of the interaction between the parents and the children, and the child's particular needs are, again -- are just but some of the variables which must be evaluated along with, again, the very specifics of this case.  And, again, the relationship, in each case, will differ and is to be evaluated on its strengths and weaknesses and on its merits.

"And the court, in listening to Dylan's testimony, it discerned from Dylan's testimony, again, a very conflicted young man, who was torn and anguished by the

15

prospects that face him in his young life. And this is something that -- it is readily apparent that he has thought about, undoubtedly, that he has -- he has grieved over, and that grief was apparent in his testimony. He cried, and he was unable to continue to discuss this issue for a significant period of time. I would estimate somewhere between approaching 20 minutes; certainly in that neighborhood, 15 to 20.

"And, again, these are difficult issues, and Dylan has been a consumer of this process over the years, and that he arrived at the conclusion that --- that what came through in his testimony was his desire for certainty, for the room and the environment in which he can -- his needs can be met, in which he can grow, in which the chaos and disruptive qualities of life can be minimized, and he can get on with the serious business of being a 12-year-old, and this was something that was -- obviously, that was not easy for him to come to.

"I think he does care for his mother, and the court is tasked and does make the independent evaluation, absent an objection by Dylan to be adopted, is whether -- notwithstanding his statement, that does not end the inquiry. The court makes this evaluation and arrives at a decision based on the facts that the -- that the exception with reference to Dylan does not apply, that the benefits of a continuing relationship with his mother, given the nature and the quality of the relationship, do not outweigh the benefits to be derived through adoption and through permanency that is going to be provided by adoption.

"The court would note that the same considerations are brought to bear by the court, saying the sensitivity is brought to bear by the court in evaluating Christopher's circumstances. So the court is no less cautious in making this evaluation, notwithstanding what the court might characterize as Christopher's more casual or less emotional reaction to the issues that were -- that he was presented with, that one could interpret that in a couple of different ways.

16

"Certainly, one way which it could be interpreted, and I think the better part of caution is the screening through which the court does evaluate it is through the understanding of a 10-year-old, and the consequences of the impact on his life is something that, at 10, he's not in a position to make a careful and as considerate evaluation as a court is required to bring to bear.

"So the court looks at Christopher's situation and, indeed, Emily['s] situation with the same sensitivity and the same concern for the nature of the importance of family, family connection that it does for Dylan's. And the court, unfortunately, for mother, is going to -- and has reached and does reach the conclusion that under [various published cases], that the nature of the relationship that mother has with each of the children is not such as to outweigh each child's -- the benefit of each child to be derived through permanency of adoption."

### 4. Analysis

Here, there is no dispute mother maintained visitations with the children, although the visitations were often problematic. Further, there was some evidence mother's relationship with the children was, on some level, beneficial. However, the testimony of the witnesses and the reports provided substantial evidence to support the juvenile court's ruling that mother failed to establish the severance of the parental relationship would be harmful to the children. (See *In re G.B.* (2014) 227 Cal.App.4th 1147, 1165-1166 [""" it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement""""].)

Further, when "weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home" there is no question—given the court's extensive, thoughtful, and heartfelt analysis—that the court did not reach its decision in an arbitrary or capricious manner. (See *Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Thus, the juvenile court did not commit error when it ruled the benefit exception to the statutory preference for adoption did not apply. The published opinions cited by mother on this point are unpersuasive and/or factually distinguishable. (See, e.g., *In I.R.* (2014) 226 Cal.App.4th 201, 212-213 [juvenile court abused its discretion in finding two children were within beneficial parent relationship exception to the preference for adoption]; *In re Scott B.* (2010) 188 Cal.App.4th 452, 471 [court erred in finding benefit exception did not apply where child preferred to live with mother and a court appointed special advocate repeatedly stated mother had close relationship with the child and it would be detrimental for parental bond to be disrupted]; *In re Amber M.* (2002) 103 Cal.App.4th 681, 690-691[court erred in finding benefit exception did not apply where three experts testified children's relationship with their parent clearly outweighed the benefits of adoption]; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [the juvenile "court properly concluded no exceptional situation existed to forego adoption"].)

III

DISPOSITION

The orders of the juvenile court are affirmed.

MOORE, J.

WE CONCUR:

O'LEARY, P. J.

ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, Division Seven, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.